# EXHIBIT A

**TOTAL SAFETY SERVICES, INC.**
**218 MAGNOLIA STREET**
**LONG BEACH, MISSISSIPPI 39560**

**ACCIDENT INVESTIGATION – SAFETY CONSULTING - LITIGATION SUPPORT**

---

# WILLIE HAWKINS
# VERSUS
# SEA SUPPORT VENTURES, LLC,
# and M/V MISS ALINE

**DATE**
**December 21, 2021**

**CIVIL ACTION: 2:21-cv-00661**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**JUDGE JANE TRICHE MILAZZO**
**MAGISTRATE JUDGE**
**MICHAEL B. NORTH**

**Prepared for**

## MR. JEFFERSON TILLERY & MR. JUSTIN J. MAROCCO
## JONES, WALKER, LLP
## 445 NORTH BOULEVARD, SUITE 800
## BATON ROUGE, LOUISIANA 70802

**TELEPHONE NO.:(504) 415-0945**
**111TOTAL@GMAIL.COM**

# INTRODUCTION

This **preliminary** ROOT CAUSE ANALYSIS report investigates the accident that occurred aboard the ***M/V MISS ALINE,*** an Offshore Supply Vessel, owned by Sea Support Ventures, LLC, performing Lightering duties off the coast of Freeport, Texas, on or about September 13, 2020, at or about 0530 hrs., and outlines the findings from that investigation.

# QUALIFICATIONS

***Please see my Curriculum Vitae for a further explanation of my qualifications as a Safety Professional.***

**QUALIFICATIONS:** A safety professional, in any given industry, is required to have a working knowledge of the various operations his company performs in that industry, as well as a working knowledge of the applicable governing regulations. I have over 50 years of safety experience in the industries relating to the exploration, production, and transport of oil and gas and the marine, general, and commercial industries. While working in these industries, I have developed expertise relating to safety issues on production platforms, barges (derrick, crane, pipe laying, dredging, drilling, jack-ups, lift-boats, spud, supply, deck, oil, tank, etc.), structural, fabrication yards, and vessels/boats (ship, MODU, tug, tow, supply, crew, etc.), and commercial and industrial buildings and building projects.

This on-the-job work experience began in the mid-sixties while working offshore in the Gulf of Mexico on production platforms and drilling rigs, performing the duties of a Roustabout, Rigger, Welder's Helper, and Wireline Operator. I also worked on the Mississippi River, worked in Fabrication yards and Shipyards as a Roustabout, Rigger, Welder's Helper, and Heavy Equipment, and Crane Operator. Further safety experience and expertise were derived from being the manager/supervisor of the Safety Department for Amerada Hess Corp. (Lafayette region); J. Ray McDermott, Inc. (Marine and Diving Divisions, Harvey Group), McDermott International, Inc. (Singapore, South East Asia Group) and the president or owner of Contract Safety Consultants, Preferred Employees, and Total Safety Services, Inc. Companies I worked for included, New Orleans Stevedores, Houma Welders, Smith Wallander, Boland Machine, and Manufacturing. My safety consulting experience was gained by providing safety consultant services at the following: Gulf South Laboratories, Engineering Inspection and Investigation, Inc., Inspection Consultants, Inc., Ray Gibbins Industries, Allied Wireline, Western Wireline, Popich Brothers, Space, L&L Construction, Kaough & Jones, Kranco, Garza Welding, T & A Wireline, TCB Industries, Rembco, Foley Construction, Delta Coatings, Delta Temp, Inc., Cortex, Southern Environmental Control, Eagle Marine, American Marine, Mosby Enterprises, Total Marine Services, Vela Garage, Doomlar, Energy Drilling, Grady Crawford, Guilliot Construction, J & J Electric, Taylormade Enterprises, U. S. Abatement, Vogt Construction, Wescorp Construction, and Blake Drilling,

The companies I was employed by or contracted with followed the Federal regulations listed below and voluntarily followed the Industry Standards of Care as listed. As their safety officer, I was required to have a

working knowledge of those regulations and standards of care and the ability to apply them to the company's oil and gas exploration and productions and marine, general, industrial, and commercial work activities.

**Subcategories for each section are listed in more detail in my *Curriculum Vitae.***

**Working knowledge of Federal Regulations 29:**
1910 General Industry, 1926 Construction, 1915 Shipyard, 1918 Longshoring, 1919 Gear Certification

**Working knowledge of Federal Regulations 46:**
Subchapter C - Uninspected Vessels
Subchapter D – Tank Vessels
Subchapter H – Passenger vessels
Subchapter I - Cargo and Miscellaneous Vessels
Subchapter I-A - Mobile Offshore Drilling Units
Subchapter K – Small Passenger Vessels carrying more than 150 passengers
Subchapter L – Offshore Supply Vessels
Subchapter M – Towing Vessels
Subchapter T – Small Passenger Vessels

**Working knowledge of Federal Regulations 33:**
Subchapter B – Offshore
Subchapter N - Outer Continental Shelf Activities

**Working knowledge of the following industry standards:**
(API) American Petroleum Institute
(ANSI) American National Standards Institute
(ASME) American Society of Mechanical Engineers
(AWS) American Welding Society
(CGA) Compressed Gas Associations, Inc.
(ASTM) American Society for Testing and Materials
(ABS) American Bureau of Shipping
(NFPA) National Fire Protection Association
(NIOSH) National Institute for Occupational Safety and Health
(SAE) Society of Automotive Engineers
(UL) Underwriters Laboratories
(NEC) National Electrical Code
(AWO) American Waterways Operators
(ISM) International Safety Management
(SSPC) Steel Structures Painting Council.

# METHODOLOGY – ROOT CAUSE ANALYSIS

The evaluation tool I use to investigate and analyze an accident is based on widely recognized and accepted accident investigation analysis principles and methods employed in the safety profession: the **ROOT CAUSE ANALYSIS (RCA)**.

My **ROOT CAUSE ANALYSIS (EVENTS AND CAUSAL FACTOR ANALYSIS)** is used to investigate this accident and my report is a structured step-by-step technique and procedure for ascertaining and analyzing the causes of accidents. The PROBLEMS AND DEFICIENCIES listed below in my report are examples of the major accident categories that should have been included when the crew completes a **(JSA)** and would be included in a ROOT CAUSE ANALYSIS investigation:

**EXEMPLARY MAJOR ACCIDENT CATEGORIES**
**EQUIPMENT / MATERIAL PROBLEMS,**
**PROCEDURE PROBLEMS,**
**DESIGN PROBLEMS,**
**TRAINING DEFICIENCIES,**
**MANAGEMENT PROBLEMS.**

Examples of the accident subcategories listed in my report address the specific accident PROBLEMS AND DEFICIENCIES related to the accident:

**EXEMPLARY SUBCATEGORIES**
**DEFECTIVE TOOLS / EQUIPMENT,**
**PRE-EMPLOYMENT EMPLOYEE EVALUATION,**
**PRE-JOB / EMPLOYEE EVALUATION (JSA),**
**PERSONAL PROTECTIVE EQUIPMENT,**
**TRAINING / CERTIFICATION / LICENCES,**
**FEDERAL AND /OR STATE STANDARDS / INDUSTRY STANDARDS,**
**INDUSTRY SAFETY MANUALS AND PUBLICATIONS.**

# ROOT CAUSE ANALYSIS

## I. DATA COLLECTION

The following documents were reviewed in preparation for this preliminary root cause analysis report:

**Deposition Testimony:**

- Mr. Willie Hawkins, Jr.
- Captain Maurice O'Brien
- Captain Michael Skinner
- Mr. Henry Vertrees, Jr.
- Captain Burnell Dominque
- Mr. Jonah Ledwell
- Mr. Jude Orgeron

**Miscellaneous documents:**

- **SEA SUPPORT VENTURES, LLC – PERSONAL INJURY AND ILLNESS REPORT**
- **SEA SUPPORT VENTURES, LLC – NON-CONFORMITY REPORT**
- **PHOTOGRAPHS**
- **PLAINTIFF'S ORIGINAL COMPLAINT**
- **JOB SAFETY ANALYSIS**
- **MR. MICHAEL STOLLER'S EXPERT REPORT**

# II. ACCIDENT DESCRIPTION

Mr. Willie Hawkins, Jr. was employed as a Deckhand by Sea Support Ventures, LLC, and assigned to work aboard the ***M/V MISS ALINE***, an Offshore Supply Vessel, which was contracted to TeeKay Corp. and converted to assist in performing Lightering duties off the coast of Freeport, Texas. Captain Michael Skinner was the Master of the ***M/V MISS ALINE***, and Captain Maurice O'Brien was his relief captain. Mr. Johah Ledwell was the Mate/Deckhand. Mr. Henry Vertrees was a QMED member of the engineering department. Mr. Jude Orgeron was a Deckhand, as was Mr. Willie Hawkins.

Just before Mr. Willie Hawkins' alleged accident, he and the crew were assisting in rigging down TeeKay Corp's equipment and storing it on some pallets and in a CONEX box located just stern of the vessel's forward structure. Part of the TeeKay Corp's equipment was two rope/cable/fender chocks that had to be stored. Mr. Willie Hawkins testified that he was carrying one chock in each hand as he made his way to the storage area. As Mr. Willie Hawkins passed the vessel's winch, he stepped off into the area between the winch's oil storage container and the wooden deck boards. Mr. Willie Hawkins allegedly sustained his injury at this time.

# III. ASSESSMENT / OPINIONS

***The following opinions are preliminary and may be amended, added to, or changed as other discovery and deposition testimony is provided.***

# OPINION NO. 1

## NO PROBLEM WITH REGULATIONS

**THE OPENING BETWEEN THE WINCH'S OIL STORAGE TANK AND THE WOODEN DECK BOARDS DID NOT VIOLATE ANY COAST GUARD REGULATIONS.** It is my opinion based on my education, training, and experience that the presence of an opening between the winch's oil storage tank and the wooden deck, did not violate any applicable Coast Guard regulations.

The ***M/V MISS ALINE*** is an Inspected vessel by the United States Coast Guard and routinely undergoes inspections by the Coast Guard before they issue the vessel a Certificate of Inspection, (COI). The Vessel Documents and Certifications, included in Mr. Stoller's report on Page 8, show the COI was last issued on May 7, 2021. Additionally, the COI also shows the vessel receiving compliance documents from SOLAS and ISM. Unlike Mr. Stoller, the Coast Guard, and American Bureau of Shipping's inspectors, who performed these inspections, specifically looking for violations and safety deficiencies relating to their publications, did not find any violation, and issued the listed compliance certificates to the ***M/V MISS ALINE***.

**MEREX REPORT -Mr. Stoller also includes several other regulations and standards in his report:**
The OSHA standards can be used by the Coast Guard Inspectors if they find a serious safety violation that the Coast Guard's codes do not specifically cover. It must be assumed that the Coast Guard Inspectors, on the various and numerous times this vessel was inspected, did not find a violation of the OSHA CFR 29 1920. (a)(22) Regulations as the certificates were issued.

**MEREX REPORT- Mr. Stoller includes in his report the requirement for frequent inspections of this vessel:**
The ISM code, as listed by Mr. Stoller, states
*(d) Ensure compliance with mandatory rules and regulations, taking into account relevant national and international regulations, standards, codes and maritime industry guidelines, when developing procedures and policies for the safety management system" [33 CFR part 96.230, What objectives must a safety management system meet]?*

There is no evidence that Sea Support Ventures failed to ensure compliance with the mandatory rules and regulations that applied to this vessel. Mr. Stoller in his report failed to list one mandatory rule, code, or regulation that was violated. Again, Coast Guard, ISM, and SOLAS issued certifications for this vessel after conducting their inspections.

The testimony of all the witnesses confirmed that both the vessel captains and the deck crew frequently inspected their vessel and corrected violations when the hazards were discovered. It was the duty of the deck crew, as they worked on this vessel, to inspect their work area and abate or report any unsafe condition they found. This requirement also fell on Mr. Willie Hawkins as a deckhand on this vessel. Mr. Willie Hawkins testified that he saw the clutter in front of the winch and decided to avoid the clutter,

choosing to step around it, instead of stepping over the clutter. Mr. Willie Hawkins's job was to abate the hazard, clean the area up, and not just avoid the hazard.

It has been my experience since 1969, working offshore on Offshore Supply Vessels and other vessels, crew boats, barges, etc., that cargo decks are typically covered with wooden decks to protect the steel decks from becoming damaged when cargo is set down on them. On all of those vessels, and everywhere there is a wooden deck on top of steel decks, there is a small drop off as the deck transitions from a wooden deck to the underlying steel deck.

As I was in charge of the pre-Coast Guard and ABS inspections for the various companies when I was employed as their Safety Supervisor or contracted as a Safety Professional, I have never been written up by the Coast Guard or ABS for a safety hazard dealing with the drop off between the wooden deck and the steel deck. Additionally, of the thousands of accident investigations that I have performed in my 52-year career as a Safety Professional, I have never investigated an accident where someone had stepped off or fallen off the wooden deck. I have never asked any company to paint the steel deck next to the wooden deck yellow to alert someone of that alleged hazard. My experience and that of Captain Maurice O'Brien, with the drop-off between the wooden deck and the steel deck is an accepted practice for years prior to Mr. Hawkins' alleged accident:

**CAPTAIN MAURICE O'BRIEN TESTIFIED AS FOLLOWS:**

Page 55: Q (By Mr. Chapel) And looking back here at Exhibit -- Exhibit 3, looking at the -- the space that the crew actually had to work in and to walk and the width and depth of that channel, do you think it was

Page 56: safe for them to be working in and around that box with things in this condition?

Page 56: A Yes, I think it was very safe. I never had any issues with it, nor did anybody else before that I'm aware of.

Page 58: Q (By Mr. Chapel) Okay. And as far as you know, could -- could y'all have put something over it, the channel, so that there -- there was no gap between the level of the deck and the tank or the box?

Page 58: A Uh, we certainly could have. That was discussed in hindsight. But in all of the boats that I've worked on, I have never seen that done.

Page 59: Q (By Mr. Chapel) Okay. But you would agree that if something can be done to make it safer for you or the other crew onboard, that that's something that's your responsibility, that's something that you want to do, right? A. It's something that we would want to do, yes, sir, but, you know, we all work with -- within maritime norms, I would say. And I -- like, I've never seen -- had this to come up before. And I've worked on many, many boats, many, many times with deck winches that had channels around them and just never had an issue with it.

Page 60: Q (By Mr. Chapel) Okay. And in hindsight, I understand -- are these things that you wish that you would have done or would have been done to avoid Willie getting hurt?

Page 60: A Uh, sure. I -- I -- I like Willie. I don't like to see anybody get hurt. But, you know, you can't make everything completely safe. It's just never going to happen. But in that

instance right there, yes, that -- which I had never seen happen before, nor had anyone else, the other masters or captains that had been on there, no one came with the idea that that should be filled in.

Page 67: Q Now, we talked a little bit before -- I think you agreed with me -- that there were things that could have been done to make this situation safer in the area around the Conex box and the deck winch, correct? A. In hindsight, yes, it could have been made safer. I just -- on all the boats that I've worked on in the past, I've never seen anything like that done to fill those channels.

Page 75: Q And -- understood. And on the vessels that you've been on in the marine industry, have any had a similar -- call it gully or trough or -- or what's -- the area that's depicted where your foot is on Exhibit 3, have any had a similar type of con -- configuration? A. As I remember, all of them were like that. Q Okay. So, this was not a unique configuration, in your experience? A Not to my recollection, no, sir.

Page 75: A I have not worked with many -- we used to call them anchor boats when we would move semi-submersibles and things of that nature. I ran a boat for several years -- several boats that had deck winches on it for moving anchors and what have you, and they all were configured like that.

# OPINION NO. 2

## STOP WORK AUTHORITY PROBLEM

**MR. WILLIE HAWKINS' FAILURE TO USE HIS STOP WORK AUTHORITY AND REMOVE THE OFFENDING ITEMS ALLEGEDLY BLOCKING HIS PATH OF TRAVEL.** It is my opinion based on my education, training, and experience that Mr. Willie Hawkins should have simply put the rope/cable/fender chocks down and removed the offending items from his walkway. As shown below, Mr. Willie Hawkins had been working on this job for two years, and had been working long hitches of two to three months. The deck crew, including Mr. Hawkins, was tasked with keeping good housekeeping standards on this vessel. The vessel held safety meeting and held JSA meetings every day. Alternatively, Mr. Hawkins should have stopped what he was doing and cleared the path he intended to use. Mr. Hawkins should have evaluated his path of travel before carrying the two chocks. Mr. Hawkins could have placed the chocks on the oil tank and then removed the alleged tripping hazards.

**MR. WILLIE HAWKINS, JR. TESTIFIED AS FOLLOWS:**

Page 37: Q. Would you be primarily working on this back deck? A. **I was working on the back deck**.

Page 37: Q. When you were off, would you go in the galley? Was there a galley on the ship? A. When I was off and **we put all the stuff out and we waiting to pick the stuff back up,** while we're

Page 38: off, we do, like, cleaning supply. **Cleaning up from the top to the bottom**, cleaning the galley, cleaning the toilets and all of that up.

Page 41: Q. How long had you been doing this job for Teekay? A. Like I say, I've been out there **two years** for the company.

Page 44: Q. Was this your first hitch on the MISS ALINE? A. No, sir. Q. You had had hitches before? A. Hitches before. Q. Do you know how many hitches before? A. No, but I had hitches before. **And long hitches.**

Page 44: Q. You had mentioned you would do hitches -- A. **Three months, four months at a time.**

Page 45: Q. Where would these places be that you're talking about? A. Between the galley wall, the toolbox, and the winch and all of that. They had a passageway, but -- the passageway supposed to be free, but they had all **kind of pallets and all kind of stuff piled up**. You couldn't hardly walk. It wasn't safe. You get what I'm saying? That's where the accident happened at. **Because it was dark, with no lights**. You get what I'm saying? And it was so **dirty back** there. **I couldn't see where I was going**.

Page 53: Q. Prior to this, did y'all do a safety meeting or anything? A. **We do a safety meeting every morning before we go out.**

Page 53: Q. And that included this morning? A. That was that morning. We go out. **We do safety meeting all the time.** Q. Who would participate in the safety meeting? A. O'Brien or Skinner.

Page 53: Q. So you'd have a captain and then would it be all of the members of the crew on that shift? A. **Everybody be together. Q. You did one that morning? A. We did one that morning.**

Page 54: Q. Did y'all do **JSAs** on the MISS ALINE? A. **We do that, too**.

Page 55: Q. You did the **JSA that morning**? A. **Yeah, we dos that**.

Page 58: Q. That's the foot of Maurice O'Brien? A. That's his foot right there. **It had all of**

**Page 59: the pallets and iron and everything right along up in there. You couldn't even walk.**

Page 78: Q. Specifically, you had seen the area in the light, correct, prior to this? A. **I know the pallet was there**. Q. You knew, because you had seen the area before this incident, that the walkway was limited in that area, correct? A. But at the time -- at the time, **I wasn't thinking about all of that**.

Page 82: Q. You knew it was unsafe. At the time that you were crossing this area, you knew it was unsafe, correct? A. Like I'm saying, at the time, **I wasn't thinking about none of that. I just was doing the job.**

**CAPTAIN MICHAEL SKINNER ACTUAL TESTIMONY:**

Page 31: -- my basic rule of thumb was hey, if you see something that doesn't look right, let myself or Captain O'Brien know so we can look into it and see what's going on. But basically keeping everything straightened up on the vessel and all this kind of stuff and don't leave anything that's going to be a tripping hazard out or anything like that.

Page 31: Q. If I'm understanding you correctly, y'all -- you were out -- you and the other Captain were out there trying to find any issues or identify any hazards, but you also asked that people would help y'all identify them and bring
Page 32: them to your attention as well? A. That's correct. Basically it was like hey, if you see something, say something.
Page 32: Q. All right. A. Let us know. You know, if you see something that's not quite right or out of whack or if you see a hazard, let us know, because we might miss it, you know, and y'all are out there on the deck all the time, so keep your eyes open and tell us what you see and we'll address it.

**CAPTAIN MAURICE O'BRIEN TESTIFIED AS FOLLOWS:**
Page 69: Q Okay. So, if there came to be decisions about where things would go or what to do, Willie would never have been that guy, correct? A Uh -- well, we put a great deal of -- of -- of faith in Willie's ideas and his input and stuff. If he had had an objection, it -- it certainly would have -- have been properly weighed and action taken. And like I said earlier, everybody on everything that we do has stop work authority. If they see something they think is dangerous, all they have to do is stop work and we stop and either get it corrected or come to a better understanding of what we're doing.

**MR. JUDE ORGERON TESTIFIED AS FOLLOWS:**
Page 23: Q. And what kind of things did you clean up? A.· They had two pallets with some equipment for an operation that we do on the job, and they just moved it to the back of the winch, to underneath the stairs.
Page 23: Q. Were those pallets sort of blocking the walkway? A.· No.· There was a clear path to walk.
Page 23: Q. Were there any like tools or any sort of canvas bags, anything lying around?
Page 24: A. Yeah, they had a pallet with some bags, canvas bags with some tools, and they had another pallet with, they call them, some chocks

**JONAH LEDWELL TESTIFIED AS FOLLOWS:**
Page 65: Q. Okay.· And you would expect your deckhands, if they saw clutter or an issue prior ·to, let's just say, walking in a particular·area, if they saw any issues that needed to be ·cleaned up, they would do that before walking in ·that area? ·A. Yes.
Page 67: ·Q.· And that's your expectation as the captain that if someone else who has firsthand ·knowledge seeing a potential hazard, that's your expectation as the captain that they're going to ·use their Stop Work Authority to raise the issue ·if they feel unsafe?
Page 67: ·A.·Yes.

Mr. Willie Hawkins testified that he stepped into the area between the winch's oil tank and the wooden boards because his path was blocked. Photographic evidence, Exhibit 2 of Mr. Willie Hawkins' deposition, taken after Mr. Willie Hawkins' alleged accident, indicates that the items in the pathway

were very small and could have been easily moved by Mr. Willie Hawkins. Mr. Willie Hawkins failed to follow good housekeeping and the directives given him by his captains to abate any hazard that he saw or he could have reported the hazard to someone. The photograph shows the deck as it was at the time of Mr. Willie Hawkins' accident and before the area was straightened up by the entire crew.

Captain Maurice O'Brien testified on Page 50 & 51 of his deposition, that this photograph was taken on the afternoon after Mr. Willie Hawkins' accident or before the items were picked up the following day. In other words, the photograph depicts which items were present at the time of Mr. Willie Hawkins's alleged accident. Further, Mr. Vertrees testified concerning Exhibit 1 of his deposition, Exhibit 2 or Mr. Willie Hawkins' deposition, that the area in the photograph looked the same as at the time of Mr. Willie Hawkins' accident.

**CAPTAIN MAURICE O'BRIEN TESTIMONY:**

Page 50: Q Well, y'all went out and cleaned everything up 23 the next day, right? 24 A I believe it was -- I believe it was the --25 it -- it may have been the next day, but I thought it

Page 51: was later that afternoon once we got into port, but it 2 could have been the day after. 3 Q Okay. So, fair to say that this photo was 4 taken sometime between when Willie got hurt and when 5 y'all cleaned it up? 6 A Yes.

**MR. HENRY VERTREES ACTUAL TESTIMONY**

Page 25: Q. If you look here in Exhibit 1, is that generally what the trough looked like at the time? A. I'd say that's probably so, yeah.

Page 26: Q.· And when you went out there to check on · the area where Willie got hurt, was there a bunch of that stuff lying around out there?· A. I would say it probably looks just like it does in that photo.

Mr. Willie Hawkins failed to perform his duties as a deckhand and pick up the items in his walkway.

**MR. HENRY VERTREES ACTUAL TESTIMONY:**

Page 28: Q.· The captain is responsible for making sure that the crew has a safe place to work, right? A.· Yes, but you've got to make sure it's up to the crew to actually do their job too.

It must be stated that this storage area, between the CONEX box and the winch, was the storage area for the equipment owned and used by the TeeKay Corp's crew. The testimony indicates that the TeeKay Corp would retrieve the equipment and use it during the Lightering activity, and then return the equipment to the storage area.

The equipment Mr. Willie Hawkins likely saw, just before his alleged accident, was likely put there just before Mr. Willie Hawkins' alleged accident. There is no evidence that the equipment that Mr. Willie Hawkins saw was there before the Lightering job beginning, or that anyone, besides Mr. Willie Hawkins, was aware that it created the hazard. It must be said again, that the deck crew, including Mr.

Willie Hawkins, had a responsibility to pick up, move, clean, etc., any hazard that they came across while performing their duties. Mr. Willie Hawkins had a duty to move the offending equipment before he entered the area carrying the two chocks.

# OPINION NO. 3

## NO PROBLEM WITH LIGHTING IN THE AREA

**MR. WILLIE HAWKINS TESTIFIED THAT HE STEPPED INTO THE OPENING BETWEEN THE WOODEN DECK AND THE WINCH BECAUSE THE LIGHTING WAS POOR.** As the testimony below shows, no one agreed with Mr. Hawkins' assessment of the lighting.

**MR. WILLIE HAWKINS, JR. TESTIFIED AS FOLLOWS:**

Page 45: Q. Where would these places be that you're talking about? A. Between the galley wall, the toolbox, and the winch and all of that. They had a passageway, but -- the passageway supposed to be free, but they had all kind of pallets and all kind of stuff piled up. You couldn't hardly walk. It wasn't safe. You get what I'm saying? That's where the accident happened at. Because **it was dark, with no lights**. You get what I'm saying? And it was so dirty back there. **I couldn't see where I was going**.

Page 64: Q. Carrying two of them, could you see in front of you? Could you **see in front of your feet where you were walking? A. No. Q. You couldn't? A. It was dark.**

Page 64: Q. Even if it was light outside, if you were carrying two of these rope chocks, could you see where you were stepping? A. **I could see, but I couldn't see down.** Q. Why couldn't you see down? A. **'Cause it was dark.**

**CAPTAIN MICHAEL SKINNER ACTUAL TESTIMONY:**

Page 88: Q. Okay. Is there -- I meant to -- is there lighting in that area of the Miss Aline? A. Around that winch? Q. Yeah. A. Yeah, there was florescent lighting. And we had some other lights that I remember that were kind of a little bit further -- or closer back to the superstructure that threw some light out there.

Page 88: Q. Were they -- were they particularly bright? Do you think they did a good job of illuminating the working environment there if it was dark out? A. Yeah. I mean, we had cameras all over, so I would kind of look at the cameras when we were picking up or laying out and it

Page 89: seemed to be lit up pretty good.

Page 92: Q. Did anyone mention to you after Willie's incident any issues with that area not being lit up at the time of Willie's incident? A. No. No.

**CAPTAIN MAURICE O'BRIEN TESTIFIED AS FOLLOWS:**

Page 70: Q Okay. Do you know -- at the time of Willie's incident, were those lights on? A I believe that those lights out there stayed on. I -- I don't ever remember there being an issue about turning those lights off unless we were in port

Page 71: and secured to the dock to help alleviate -- help keep bugs away would those lights ever be turned off.

**MR. JUDE ORGERON TESTIFIED AS FOLLOWS:**
Page 36· Q.· Okay.· Now, Willie -- Willie testified that it was about 4:00 -- 4:00 in the morning when his accident happened.· He says it was still dark · out. Was there any lighting in this area of the Miss Aline? A.· Yes, sir.
Page 36:· Q.· Willie said it was still pretty dark.· You know, in your recollection, is the lighting particularly bright?· Does it do a good job of illuminating everything? A.· It sure does.

**JONAH LEDWELL TESTIFIED AS FOLLOWS:**
Page 39: Q. Okay. Was there any lighting in that area aboard the Miss Aline? A. Yes. S ONLY Q. How much lighting is there, I guess? A. Oh, I mean, I would say it's well-lit. Q. If Willie said that he was having a hard time seeing that morning, would you agree or disagree?
Page 39: A. I -- I didn't have any trouble seeing, so I 18 don't know about him. I don't know.

*********************************************************************************************************

# REBUTTAL OF MAREX'S REPORT (Mr. Stoller's report)

**PAGE 6 OF MAREX'S REPORT:**
While working aboard the vessel, Miss Aline, at about 0400, Mr. Hawkins was carrying a deck cable guide and stepped into a **drainage gulley** causing Mr. Hawkins to sustain a leg injury. **(Emphasis Added)**

**OPINION COMMENT: The drop-off between the wooden deck and the steel deck was not a drainage gully. Captain Maurice O'Brien stated on pages 38 & 39 that the area between the winch and the wooden deck helps drain water from the deck. Captain Maurice O'Brien does not state that the Marine Engineer, who designed this vessel, created this area to drain water from the deck. The area simply is the result of installing a wooden deck in that area.**

**PAGE 14 OF MAREX'S REPORT:**
In my experience since 1975, the **side scuppers** have been painted yellow as a known hazard when walking on deck. [Exxon experience] **(Emphasis Added)**

**OPINION COMMENT: The drop-off between the winch and the wooden deck cannot be considered a "side scupper". That area was not on the side of the vessel where water would be channeled through the vessel's side scuppers overboard but was in the middle of the deck just aft of the main structure's bulkhead. Mr. Stoller's opinion may change when he is informed that this is not a "side scupper".**

**PAGE 9 OF MAREX'S REPORT:**

Sea Support Ventures owners and managers failed to ensure a full and complete daily work plan, such as a task analysis, and safety briefings were conducted each morning, as is standard practice in the maritime and construction industries. The vessel did have Job Safety Analysis (JAS) for conducting the operation of deployment and pickup of the lightering gear. However, the hazards and mitigation requirements were not followed through with. The JSA specifically states to "identify and shield uneven working surfaces or projections".

**OPINION COMMENT: Mr. Stoller is correct; the vessel did hold a JSA to cover the activity-taking place at the time of Mr. Willie Hawkins' alleged accident. The JSA does state that the crew should "identify and shield uneven working surfaces or projections". However, it must be stated that of all the inspections made by the Coast Guard, ABS, the vessel's captains, and crew, including Mr. Willie Hawkins, no one identified this drop-off between the wooden deck and the winch as a hazard. Only Captain Michael Skinner testified that he believed this drop-off was a hazard, but did not, abate the alleged hazard, or found it so minor that he did not even report it to Captain Maurice O'Brien, the master of the vessel.**

**As a crewmember, attending the JSA, that admonition to "identify and shield uneven working surfaces or projections" also fell on Mr. Willie Hawkins' shoulders.**

**PAGE 9 & 10 OF MAREX'S REPORT:**

In the OSHA example, 29 CFR 1910.22(a)(3) requires employers to (1) Ensure walking-working surfaces are maintained free of hazards such as sharp or protruding objects, loose boards, corrosion, leaks, spills, snow, and ice. (2) Ensure walking-working surfaces are inspected regularly and as necessary, and maintained in a safe condition;

**OPINION COMMENT: As stated above, OSHA does not apply to this vessel, except as used by the governmental inspection agency, the Coast Guard, during their inspections. As stated before, the Coast Guard issued their COI for this vessel many times after inspecting it for safety. If the Coast Guard inspector had determined that this area between the winch and wooden deck presented a hazard, they could have used this OSHA standard to write this vessel up.**

**PAGE 10 OF MAREX'S REPORT:**

In another example, **The American Waterway Operators (AWO),** a tug and barge industry association published their updated Responsible Carrier Program manual (Responsible Carrier Manual, pg II-1) which directs that: **(Emphasis Added)**

**OPINION COMMENT: The American Waterway Operator (AWO) guidelines are written for TOWING vessels and their guidelines were circumvented by Coast Guard regulations 46 CFR Chapter I -Subchapter M regulations. This section establishes towing vessel safety regulations overseeing inspections, standards, and options for their safety management systems. Thus, these are inapplicable to the present situation.**

**PAGE 13 OF MAREX'S REPORT:**
Mr. Orgeron states "ain't nothing on that boat really safe. That's a part of the workplace, you know. You got to pay attention [depo page 27].

**OPINION COMMENT:**

**MR. ORGERON'S ACTUAL TESTIMONY:**

Page 27: **A.·As long as you're paying attention to what 22· you was doing, I mean, it could have been safe.** 23· Ain't nothing on that boat really safe.· That's a 24· part of the workplace, you know.· You got to pay 25· attention.

**Mr. Orgeron stated that if Mr. Willie Hawkins had been paying attention, it could have been safe. Mr. Willie Hawkins had been advised by Captain Skinner to be careful while operating the winch. Mr. Henry Vertrees testified that Mr. Willie Hawkins was wearing a headlamp during the time of his alleged accident. Yet, Mr. Willie Hawkins testified that the area was dark and he could not see.**

**It appears that Mr. Willie Hawkins did not take Captain Skinner's advice when working in the area to watch where he was walking.**

**CAPTAIN SKINNER'S ACTUAL TESTIMONY:**

Page 41: Q. And you said you told the crew that hey, watch out for this, I don't -- I don't know what they're going to do with it, I don't know if they're going to take care of it, but just keep your eyes out? A. My words more than likely were just hey, be careful when you're messing around back here because **when we're using this winch**, just watch out what you're doing, **don't get in a real**

Page 42: **big hurry and watch where you put your feet. (Emphasis Added)**

**PAGE 13 OF MAREX'S REPORT:**
In the depositions, the following statements were made:
Mr. Vertrees states Captain Skinner warned him about the trough [depo page 25]. Vertrees talks about debris in the trough [depo page 25].

**OPINION COMMENT:**

**MR. HENRY VERTREES ACTUAL TESTIMONY:**

Page 24: Q.· And had anyone ever told you about the · channel or the trough here that surrounds the tank · the winch sits on? A.· I mean -- I mean, nobody had to tell me about it.· You got to see it. Q.·Well, did Captain Skinner ever sit y'all down and tell you, Watch out when you're working around the winch? A.·Yeah.· I mean, **every time we do a job, we all have a meeting**. Q.· So my question is just a little bit more specific.· Did Captain Skinner ever get together with you and tell you to watch out for this channel or this trough around the winch when you were working with the winch?

Page 25: A.· I mean, yeah, **our safety meeting** covered that.· They covered the lines, everything.

Q.· Okay.· So specifically just about the trough, did Captain Skinner warn you about the trough? A.·Yeah.

**OPINION COMMENT: Mr. Vertrees is stating that the crew held safety meetings and held JSA meetings, and the crew, including Mr. Willie Hawkins, were warned about the winch area. Mr.**

**Willie Hawkins did not take that advice seriously, as he walked into this area, saw the items in his path, and failed to pick up the items, thereby making his path clear.**

**PAGE 13 OF MAREX'S REPORT:**
In the depositions, the following statements were made:
On Page 33, Vertrees said in a meeting the entire crew discussed clutter on deck.

**OPINION COMMENT: This meeting referred to by Mr. Stoller, happened after the alleged accident and not before the alleged accident. The main topic was to talk to TK about leaving their equipment in this area and organizing stuff a little better.**

**MR. HENRY VERTREES ACTUAL TESTIMONY:**

Page 25: Q.· Okay.· And did you go out and look at the trough, the channel, after Willie's incident?· A.· We all went and looked at it.

Page 32: Q.· And you said later on you-all got together to talk about what happened?· A.· Yes.· Q.· And you say you-all.· Was that captain and everybody aboard?· A.· The whole crew.· Q. And what did y'all discuss? A.· We discussed what happened though, Willie's injury, what happened, what would need to

Page 33: be done to fix the problem.

Page 33: Q.· So what did y'all -- what did y'all figure out was the problem? A.· That the area was too full of clutter. And we organized stuff a little more better. I had -- we had TK cut down -- we had TK -- we had TK reorganize their stuff to their equipment though to that area where it would be more suitable and give a little bit of a walkway.

**PAGE 14 OF MAREX'S REPORT:**
Sea Support Ventures owners and managers **failed to ensure adequate training** in general safety procedures such as slips, trips, and falls and reporting unsafe conditions. **(Emphasis Added)**

**Based on the evidence provided to me, it is unclear the types of safety training they received from Sea Support Ventures on a monthly basis**. Management, it appears, is not committed to ensuring worker safety in the lack of proper daily briefings that are common to the maritime industry, and the failure to identify and mitigate all the hazards present on September 13, 2020. **(Emphasis Added)**

**OPINION COMMENT: Mr. Stoller seems to contradict himself here. How can he or I comment on this crew's training, as no information has been provided concerning their training? As I am sure, anyone working in this industry would know, the majority of the training given and received is On-The-Job training.**

**GENERAL OPINION COMMENT:**
**Nowhere in Mr. Stoller's report does he show where the area between the winch and the wooden deck was in violation of any government, industry standard, or guideline. He only addresses his experience with Exxon shipping where they painted their "side scupper" yellow. As stated above, this area was not a "side scupper".**

****************************************************************************************************

**FEE SCHEDULE:**

Hourly charges are from portal to portal.
All expenses are reimbursed by the client.
$1920.00 for deposition and trial testimony (a minimum 3-hour charge, includes preparation time)
$320.00 per hour for all other services provided (fees are subject to annual increases).
$ 0.86 per mile for travel

The opinions found in this report are professional safety opinions relating only to this accident. While the expert opinions concern factual circumstances, which may be found by the trier of fact to constitute fault, they are not intended to be legal conclusions, as this is a matter for the court to determine and the trier of fact to decide. These opinions are based solely upon my many years of experience in the field of safety as it relates to this particular accident and should not be compared to other opinions in other cases.

If further discovery, research, inspections, and/or review should develop additional information that would alter my opinion, the conclusions reached herein would be subject to my revision and this report amended as necessary.

Sincerely Yours

Robert E. Borison

Robert E. Borison
President
Total Safety Services, Inc.

# APPENDIX

## DEPOSITION TESTIMONY USED TO FORM MY OPINION

***This pagination may not follow the transcript of the official depositions.***

**MR. WILLIE HAWKINS, JR. TESTIFIED AS FOLLOWS:**

Page 20: Q. When you started with Sea Support, your position? A. Deckhand on a boat. Q. Okay. During your entire employment Sea Support, were you a deckhand? A. Deckhand.

Page 36: Q. Even from the basic. What vessel were you working on at the time of this incident? A. On the MISS ALINE.
Page 37: Q. Would you be primarily working on this back deck? A. I was working on the back deck.
Page 37: Q. When you were off, would you go in the galley? Was there a galley on the ship? A. When I was off and we put all the stuff out and we waiting to pick the stuff back up, while we're
Page 38: off, we do, like, cleaning supply. Cleaning up from the top to the bottom, cleaning the galley, cleaning the toilets and all of that up.
Page 38: Q. Would you ever do any maintenance work outside on the back deck? A. Yes. We grind. We chip and grind on our side.
Page 40: Q. On the day of this incident, y'all were
Page 41: doing the riding alongside to get the supplies from the offshore ship, true? A. Right.
Page 41: Q. Do you remember what company -- were you doing this job for a particular company? A. For Teekay.
Page 41: Q. How long had you been doing this job for Teekay? A. Like I say, I've been out there two years for the company.
Page 44: Q. Was this your first hitch on the MISS ALINE? A. No, sir. Q. You had had hitches before? A. Hitches before. Q. Do you know how many hitches before? A. No, but I had hitches before. And long hitches.
Page 44: Q. You had mentioned you would do hitches -- A. Three months, four months at a time.
Page 44: Q. Fair to say you had been on the MISS ALINE for a significant period of time prior to this incident? A. Right.
Page 45: Q. Where would these places be that you're talking about? A. Between the galley wall, the toolbox, and the winch and all of that. They had a passageway, but -- the passageway supposed to be free, but they had all kind of pallets and all kind of stuff piled up. You couldn't hardly walk. It wasn't safe. You get what I'm saying? That's where the accident happened at. Because it was dark, with no lights. You get what I'm saying? And it was so dirty back there. I couldn't see where I was going.
Page 46: Q. At the time of the incident, who was the captain or captains of the MISS ALINE? A. Maurice and Skinner.
Page 46: Q. Was that Captain Maurice O'Brien? A. That's right. Q. Captain Michael Skinner?
Page 46: A. Michael Skinner. Two good captains.
Page 47: Q. At the time the incident happened, had the hitch just started?
Page 48: A. No. The hitch was almost over.
Page 50: Q. Let me finish my question. What you're saying is, when you were loading the offshore ship initially from the MISS ALINE, you didn't have to walk through the area where the incident occurred? A. Right. They had the stuff right there in the front.
Page 50: Q. Gotcha. Now, you said the incident occurred at around 4:00 a.m. It was early morning? A. It was around that time. It was dark.
Page 50: A. Yeah, the boat was rocking.
Page 50: Q. If you recall, was there any recent rain? Was the deck dry or was it wet? A. Early in the morning, the deck be, like, wet.

Page 51: Q. How many people typically -- what was the crew size of the MISS ALINE? A. Three. Q. Three on each shift?
Page 51: Q. On the deck. So there were three
Page 52: deckhands? A. Three deckhands and two engineers and two captains.
Page 52: Q. Does the name Jonah Ledwell ring a bell? A. One of them.
Page 53: Q. Prior to this, did y'all do a safety meeting or anything? A. We do a safety meeting every morning before we go out.
Page 53: Q. And that included this morning? A. That was that morning. We go out. We do safety meeting all the time. Q. Who would participate in the safety meeting? A. O'Brien or Skinner.
Page 53: Q. So you'd have a captain and then would it be all of the members of the crew on that shift? A. Everybody be together. Q. You did one that morning? A. We did one that morning.
Page 54: Q. Did y'all do JSAs on the MISS ALINE? A. We do that, too.
Page 55: Q. You did the JSA that morning? A. Yeah, we dos that.
Page 56: I'm looking at 2155. So it's the
Page 56: next picture. I know there's a yellow grating right there, which is in what I understand is the gully. That was not there at the time of your incident, right? A. Right.
Page 57: I'm on 2164. You see there's an open
Page 57: door back there. Do you know what's inside A. That's where the tools at.
Page 58: It's SEASUPP 128.
Page 58: Does this look familiar to you? A. That's the hole right there?
Page 58: Q. I'm asking you. I'm trying to figure out specifically where your foot stepped when you fell. A. That's Maurice's foot right here when he took the picture.
Page 58: Q. That's the foot of Maurice O'Brien? A. That's his foot right there. It had all of
Page 59: the pallets and iron and everything right along up in there. You couldn't even walk.
Page 59: Q. I'm going to mark this as Exhibit 2. It's SEASUPP 128.
Page 59: Q. It's your testimony that that is the approximation of where your foot -- A. Yes, sir.
Page 59: Q. And is that how your foot fell at the time? A. It's just like that.
Page 60: Q. Your accident happened in the gully around the deck winch? A. No. It happened a little further back. It had all the pallets and stuff right here. It had all the pallets right here, all kinda iron and stuff right there.
Page 61: Q. Let me show you SEASUPP 129. I'll mark it as Exhibit 3.
Page 61: Q. What I'm going to get you to do is to circle on there -- I understand -- it was not marked yellow at the time of your incident, correct? A. Right.
Page 61: Q. Just circle, from your recollection, where your foot stepped and the incident occurred. A. (Witness complies.)
Page 62: Q. At the time of your incident, you were walking towards -- A. The back. Q. Was it the back or the front of the boat? A. I was going bring the iron and stuff to the back. And that's when I hit that and twisted my knee. Q. Your foot is what planted?
Page 62: A. It was the right.

Page 62: Q. When you were heading there, you were actually heading, correct me if I'm wrong, toward what would be the front of the boat, correct? A. Going like this, toward the front. Q. You were heading toward where the wheelhouse and the galley was? A. Exactly right.
Page 63: Q. Was it a rope chock, C-H-O-K-S (sic)? Does that sound familiar? A. A chock. They was orange. Q. How big are these?
Page 63: A. They was pretty big. I was bringing two of them. Q. Are they about a foot wide? A. About that wide (indicating).
Page 63: Q. These rope chocks, it looks like when you would be holding them, you'd be about shoulder width apart. Your hands would be about even with your shoulders when you're carrying them? A. Right. I'm holding them up like that
Page 64: (indicating). Q. How much did they weigh, each one? A. I couldn't tell you.
Page 64: Q. Carrying two of them, could you see in front of you? Could you see in front of your feet where you were walking? A. No. Q. You couldn't? A. It was dark.
Page 64: Q. Even if it was light outside, if you were carrying two of these rope chocks, could you see where you were stepping? A. I could see, but I couldn't see down. Q. Why couldn't you see down? A. 'Cause it was dark.
Page 66: My question is, had you walked in this area prior to the incident? A. No.
Page 67: Q. And so based on this, from what you're saying, there was no walkway? A. No walkway.
Page 67: Q. What would be -- what was in that area? Was it Conex boxes? Was it just random objects? What was specifically in that area? A. The Conex box was right here. The Conex box was right there. The pallets and all of that was on side of this. There's no walking area. No walking area up in here.
Page 68: Q. Write a C where the Conex boxes would be. A. (Witness complies.)
Page 68: Where you say the pallets were, mark that with a P. A. Right here.
Page 68: Q. Pallets of what?
Page 69: A. I done forgot what's on there.
Page 70: Q. For the entire hitch, those pallets were located in that area, correct? A. Right.
Page 70: Q. At the time you were moving this stuff to put it back from the ship, you knew that there were pallets there, correct? A. Right. Q. You knew, according to your testimony, that there wasn't a walkway in that area, correct? A. This is the walkway, right here (indicating). Q. How wide was the walkway? A. Not wide at all. Q. Are we taking a foot, 2 feet? A. I don't know, but it wasn't wide at all.
Page 70: A. I don't know, but it wasn't wide at all. Q. Could you fit both of your feet on the walkway? A. You couldn't fit both of your feet. You had to put one foot in front the other.
Page 71: Q. Can you draw like a little S in that? We're just going to put stuff. Where you've marked the S and there's a red circle, that's where you were going to place the stuff, correct? A. Back there.
Page 71: Q. Now, was this the only way to get back to that area? A. The only way.
Page 71: Q. Why couldn't you go to the right of the winch? A. It just had one way in and one way out.
Page 71: Q. It's your testimony, if we're looking at the winch -- can you put a W on the winch? A. (Witness complies.)
Page 72: Q. Based on your experience on the MISS ALINE, you couldn't go to the right of the winch and then turn left? A. No. You couldn't go all the way around.

Page 75: Right. Just so we have it all clear, can you Exhibit 3 -- circle in blue where you say caught on to.(Witness complies.)
Page 75: I've written the word caught next to where you circled. That's where you caught on after you -- A. Right.
Page 75: Q. Which captain was on duty at the time? A. Maurice.
Page 78: Q. Specifically, you had seen the area in the light, correct, prior to this? A. I know the pallet was there. Q. You knew, because you had seen the area before this incident, that the walkway was limited in that area, correct? A. But at the time -- at the time, I wasn't thinking about all of that.
Page 79: My question is simply, prior to this incident, you knew that the walkway in this area was limited, correct? A. Like I say -- right. I knowed it was there. I knowed it was there.
Page 80: Q. As far as you know, from when you first started, those pallets had been in that area, correct? A. Right.
Page 80: Q. And that walkway had been the same limited walkway, correct? A. Right. It was unsafe.
Page 81: Q. I get you can't see. What I'm asking you specifically is, you knew it was unsafe to traverse this area prior to walking, correct? A. I guess, but I had to go do what the man say, go bring it back there.
Page 82: Q. You knew it was unsafe. At the time that you were crossing this area, you knew it was unsafe, correct? A. Like I'm saying, at the time, I wasn't thinking about none of that. I just was doing the job.
Page 83: Q. When you started your hitch on the MISS ALINE, the hitch where the incident occurred -- A. Right.
Page 84: Q. -- these pallets were there, correct? A. The pallets was there.
Page 122: Exhibit No.
Page 122: 4 for identification.)
Page 123: Q. That's in the -- what's depicted in Hawkins 198, is this how you would be arranged when you were loading or unloading from an offshore ship? A. Yes, sir.
Page 123: Q. In Hawkins 198, what are those giant, black hoses? A. That's the fuel hoses.
Page 124: Q. Let's go to Hawkins 200. I'm going to have you mark this one. If we're looking at Hawkins 200, can you tell me -- it looks like -- you're facing toward where the wheelhouse would be, correct? A. Right.
Page 124: Circle where the galley door is, with a blue marker on Hawkins 200.
Page 125: Q. With the red marker, can you circle where the deck winch is on Hawkins 200? A. (Witness complies.)
Page 125: Q. From what we've described, correct me if I'm wrong, your incident occurred, based on your testimony, if you're facing the deck winch from this perspective in Hawkins 200, to the left of the deck winch, correct? A. Right.
Page 125: Q. You were walking toward -- on the other side of the deck winch, correct? A. Yes, sir.
Page 125: Q. In this actual picture of Hawkins 200, you can't see where your accident occurred? A. Right.
Page 126: Q. Does this look like the condition the MISS ALINE was in immediately prior to your incident? A. Yes, sir.
Page 127: Q. Gotcha. Can you draw a small L by where you see the ladder is?

Page 127: Q. Go to Hawkins 196. Let's go back. I think this is a better image of it. It's the first one. A. Yeah. You can see that now. I've got 200. I can see the ladder right here. Q. Mark it with a little l on Hawkins 200. A. I'm gonna put a zero.

Page 127: A. That's the ladder. Q. Here's what I'm going to write next to it. You watch what I'm doing and let me know. I'm going to write just a small l next to your red dot where the ladder is. Do you see that? A. All right.

**CAPTAIN MAURICE O'BRIEN TESTIFIED AS FOLLOWS:**

Page 10: Q And what was your position with Sea Support? A Uh, I was running as second or mate, whichever you prefer.

Page 10: Q Were you assigned to a particular vessel? A Uh, yes. Uh, the MISS ALINE.

Page 10: Q And who were you a mate for during your time aboard the MISS ALINE? A You're referring to who was the master? It was Michael Skinner. Q And what did you think of Mr. Skinner?

Page 10: A Uh, he had an excellent representation and had

Page 11: worked for Sea Support before.

Page 13: Q Would you be responsible for conducting safety meetings, safety briefings, things like that? A Yes. Yes, generally -- generally, the master would lay that out, and then he may hand it off to me to conduct the drills or safety meetings. And one thing we always emphasize, that everyone always had stop work authority.

Page 14: Q And you may have heard them called JSAs or -- A Yes. Yes, we did JSAs, Job Safety Analysis, before every activity, as far as cargo and things of that nature.

Page 14: Q And so would that be sort of every morning -- you know, every morning when you come on, are you briefing the guys on what they're going to be doing that day? A Yes. Before -- before every lightering activity, we would have safety meetings in the bridge. I would have the JSAs printed out, and we would go over what was going to be -- what we were going to be doing. Many times, we would have the mooring masters or the assistant -- mooring master assistants come up with us in the meeting and go over what we were going to be doing.

Page 18: Q Is part of the responsibility of the master walking, inspecting and making sure the vessel is in a safe condition? A Yes. But the back deck of any boat is a dynamic that is constantly changing and evolving, and that's where we come in and rely on the eyes and ears of our deckhands and stop work authority, that if they see something that's dangerous, that they bring it up to us and then we correct it.

Page 19: Q Okay. I think I understand what you're saying. As part of your responsibilities, do you periodically make rounds to do inspections? A Yes. I always would walk the deck before we sailed to go on a -- to go out on a trip.

Page 31: Q Do you remember anything about the -- the specific job that you might have been doing at the time Willie got hurt?

Page 32: A Yes. We had finished our -- our lightering duties offshore and we were headed back into Freeport. I was in the bridge at the wheel.

Page 35: SEASUPP 00120. Q ALINE. And the name of the customer is Teekay? A Correct.

Page 36: Q And it says here you all cut out of Freeport? A Yes.

Page 36: Q So you noted that the time of occurrence was about 5:30 in the morning? A Yes.

Page 37: A I -- I don't -- from -- he must have told me he fell down, but I didn't remember -- now, I don't remember anything about him falling. I remember that he stepped and his foot went off the edge of part of the deck and it twisted his knee, and he -- he caught himself.

Page 38: the galley area where that starts is a bulkhead.Just aft of that bulkhead there'sa deck winch.Well, to help run water off the deck, there is a channel about -- I guess it would be 3 incheswide that runs immediately next to that winch so that water can run into it and is -- is taken off the deck.And he -- as I understood it, as he explained to me, he was going around the winch and up

Page 38: moving forward on the vessel. There's a Conex box to his left. The winch would be to the right. He stepped over to the right. His foot was half on and half off the -- the edge of that channel. And when he either moved forward or turned, or something like that, his foot rolled and caused -- caused him to -- to twist his knee.

Page 39: Q It says, Between the Conex box and winch where the deck level changes, it lowers about 2 inches port side.

Page 39: Q Okay. And you said the -- the gap between the -- the decking and the -- I guess the winch housing itself? A Yes, sir. There's an oil tank that the winch actually sits on, an oil reserve, and that's the base for the winch. And it's -- it's probably 2 feet high, and then the deck goes around that. There's a channel around it to help take water off the deck.

Page 39: Q And how wide did you say the channel was? A As -- as I remember, it's probably 3 inches wide, about 2 inches deep.

Page 39: Q Wide enough to get your foot caught in? A Well, you couldn't get your whole foot down in it but you could -- you could certainly -- if you stepped on it, your -- you could roll your ankle, or your foot would -- would roll over on it. I don't think you could possibly get a foot caught down in it.

Page 42: (Exhibit 2 marked.)

Page 43: Q Is this called a Nonconformity Report?

Page 43: -- I'm not sure who typed that up. Uh, it -- it possibly could have been our man that was in charge of safety after he got input from all the people involved on the boat to see what could be done or the -- the root cause of the -- of the issue.

Page 43: Q Okay. And what would -- and what was the safety man's name? A I -- I don't remember. Q Would it have been Ed Mott?

Page 44: Q Let me see if I can -- here we go. Over time, the Officers, Crew and Customers allowed a slow -- steady but slow increase in cluttering between the port Conex box -- A And the deck winch.

Page 44: Q -- and the deck winch. This narrowed the walkway and was the primary reason for Willie Hawkins

Page 45: injuring his knee. Did I read that -- A Yes. Q -- correctly? A Yes, sir.

Page 45: Q Do you think that that was a -- a fair description of what happened and why Willie wound up getting hurt? A Uh, it was -- at a minimum, I think it contributed to -- to Willie getting hurt.

Page 45: Q I mean -- and you signed off on it, so it was something that you agreed with, right? A I -- I -- I agree with that statement that over time, that there was a steady increase in the clutter between the Conex box and the deck winch, yes.

Page 46: Q It says, Eliminate the clutter near or on walkways. Did I read that correctly? A Yes.

Page 46: Q Okay. It says -- right down below that, it says, Preventative action plan. Make sure all gear is properly stowed away. Did I read that correctly? A Yes.

Page 46: Q And is that something you made sure was done? A Yes. Everybody, the master and all of us, got together, and -- with the mooring master assistants and the deckhands. We went out there and tried to put things in a -- in a better way to -- if we didn't have a place to store something, to make one. Q And then if I scroll down, I think it actually says here that this was prepared by Ed Mott. A Yes.

Page 47: Q And so what -- what sort of things did you do? A We had a -- a few bags of tools that we moved. Uh, I believe they went into that Conex box. We had a spool -- I forget -- it was either line or cable that was some extra in case we had a -- a -- broke something. We moved it over to where we -- about a foot to port so that there would be a larger opening going in between the Conex box and the deck winch. Q How much -- how much space do you think was there to walk in before y'all went out and cleaned everything up?

Page 47: A Just off the top of my head, I would say about a few or a foot and a half.

Page 47: Q Do you think it was enough space to work safely?

Page 48: A Yes, I do.

Page 48: Q So, if I'm following you correctly, there was about a foot, a foot and a half between that oil tank and then this debris? A No, the -- the -- yes. Yes. I -- you're right about that. Most of the debris would have been the tools. They had bags of shackle pins, uh, some wire, roll of small single-strand wire that they would use occasionally. They may have pairs of pliers to cut the wire with or bend the pins with. Those were in canvas bags. Those would have all been tucked off to the left side. The deck winch would have been on the right side if you're moving forward. So, I would say there would have been -- I would say that there was a foot of space to walk.

Page 49: Exhibit 3 is SEASUPP 000128.

Page 49: Q And is this the -- this photo here, Exhibit 3, does that depict the deck and the channel and the oil

Page 49: tank that we've been talking about here?AYes.The -- that piece of line you see just to the right of my right leg, that's a line that feeds on and off the winch.That – A. Yes. -- and then you have the -- my -- my right foot

Page 49: 19 A Yes. The -- that piece of line you see just to 20 the right of my right leg, that's a line that feeds on 21 and off the winch. That -- 22 Q Yes. 23 A -- and then you have the -- my -- my right foot 24 is down in that channel and then the deck boards, where 25 my left foot's going forward.

Page 50: Q Well, y'all went out and cleaned everything up 23 the next day, right? 24 A I believe it was -- I believe it was the --25 it -- it may have been the next day, but I thought it

Page 51: was later that afternoon once we got into port, but it 2 could have been the day after. 3 Q Okay. So, fair to say that this photo was 4 taken sometime between when Willie got hurt and when 5 y'all cleaned it up? 6 A Yes.

Page 52: is 000129. I'm going to mark that as Exhibit No. 4.

Page 53: Q And it looks like the channel has been cleaned out and painted yellow, correct? A Yes. But I was not there when that was painted yellow.

Page 55: Q (By Mr. Chapel) And looking back here at Exhibit -- Exhibit 3, looking at the -- the space that the crew actually had to work in and to walk and the width and depth of that channel, do you think it was

Page 56: safe for them to be working in and around that box with things in this condition?

Page 56: A Yes, I think it was very safe. I never had any issues with it, nor did anybody else before that I'm aware of.

Page 57: Q Okay. So, if it was cluttered that way, you don't -- you don't think at all that that clutter or having people walk right up next to that channel is unsafe in any way?

Page 57: A It is better the other way, to have less clutter and to have that channel painted. It -- it certainty would be better, but we walked around there hundreds and hundreds and hundreds of times and never had an issue.

Page 58: Q (By Mr. Chapel) It is better, and by that, you mean safer for the crew and everybody to have that channel cleared -- cleaned out and properly marked and identified, painted yellow like it is now, right?

Page 58: A Uh, ye -- I'm not going to say that it was improper for it to be that way. But the other way is safer, yes.

Page 58: Q (By Mr. Chapel) Okay. And as far as you know, could -- could y'all have put something over it, the channel, so that there -- there was no gap between the level of the deck and the tank or the box?

Page 58: A Uh, we certainly could have. That was discussed in hindsight. But in all of the boats that I've worked on, I have never seen that done.

Page 58: Q (By Mr. Chapel) And you -- do you think it would be safer to do so, though?

Page 58: A Uh, you -- you would -- you would need a welder and some extensive reconfigure -- not reconfigurating [sic] -- but securing that whatever you filled it in with -- probably what would be used would

Page 59: be a deck board to keep it in place because if we get a big sea on deck, it's just going to float off somewhere. So, as far as just doing it real quickly and laying something in there, no, there's -- personally, I do not see an issue with having that channel open. I've worked on many boats many times with deck winches and there's never been an issue such as we had this time.

Page 59: Q (By Mr. Chapel) Okay. But you would agree that if something can be done to make it safer for you or the other crew onboard, that that's something that's your responsibility, that's something that you want to do, right? A It's something that we would want to do, yes, sir, but, you know, we all work with -- within maritime norms, I would say. And I -- like, I've never seen -- had this to come up before. And I've worked on many, many boats, many, many times with deck winches that had channels around them and just never had an issue with it.

Page 60: Q (By Mr. Chapel) Okay. And in hindsight, I understand -- are these things that you wish that you would have done or would have been done to avoid Willie getting hurt?

Page 60: A Uh, sure. I -- I -- I like Willie. I don't like to see anybody get hurt. But, you know, you can't make everything completely safe. It's just never going to happen. But in that instance right there, yes, that -- which I had never seen happen before, nor had anyone else, the other masters or captains that had been on there, no one came with the idea that that should be filled in.

Page 64: It is SEASUPP 002161, and I will mark it as Exhibit 5.

Page 64: Q (By Mr. Chapel) Is this the same -- I guess first off, is what we see here in Exhibit 5, is this the same area, the same decking, the channel, and the oil reservoir that we've been talking about this whole time? A Yes.

Page 64: Q Would this be the sort of fabricated piece that you were referring to earlier that would be able to fill in the channel? A Yeah, it's not going to be the same level. Those deck boards are a full 2 inches thick. That grating like that is only about a -- as I remember, about an inch and a quarter thick. But, yes, that would be -- that would be a great way to help fill it in.

Page 65:I'm looking at 2165. This box here, is that what you're referring to? A Yes. I don't ever remember seeing that.

Page 67: Q Now, we talked a little bit before -- I think you agreed with me -- that there were things that could have been done to make this situation safer in the area around the Conex box and the deck winch, correct? A In hindsight, yes, it could have been made safer. I just -- on all the boats that I've worked on in the past, I've never seen anything like that done to fill those channels.

Page 67: Q Okay. But in terms of, you know, making sure

Page 68: that clutter was taken care of and put away, you know, that -- that was something you're familiar with, though, right? A Yes. Yes, and that's where -- that's the part where we rely on our deckhands and the mooring master assistants, who take care of their gear in the operation and just -- it was in a gradual state of decline and added up. We're always getting more and more things to work with on the boat, and sometimes it seemed like we

Page 68: just run out of space.

Page 69: Q Okay. So, if there came to be decisions about where things would go or what to do, Willie would never have been that guy, correct? A Uh -- well, we put a great deal of -- of -- of faith in Willie's ideas and his input and stuff. If he had had an objection, it -- it certainly would have -- have been properly weighed and action taken. And like I said earlier, everybody on everything that we do has stop work authority. If they see something they think is dangerous, all they have to do is stop work and we stop and either get it corrected or come to a better understanding of what we're doing.

Page 70: Q As far as making decisions, between the deckhands, even, you would rely on your senior deckhands or an AB, they would be the people in charge over Willie? A That is correct.

Page 70: Q Okay. In the area where Willie's incident occurred, are there -- were there lights in that area? A Yes.

Page 70: Q Okay. Do you know -- at the time of Willie's incident, were those lights on? A I believe that those lights out there stayed on. I -- I don't ever remember there being an issue about turning those lights off unless we were in port

Page 71: and secured to the dock to help alleviate -- help keep bugs away would those lights ever be turned off.

Page 71: Q How would you describe the brightness of those lights? Were they bright? Were they dull? A I -- I think they were more than sufficient. I don't think they were dull. Q Would you describe the area as a dark area where Willie's incident occurred? A Not necessarily, no.

Page 71: Exhibit 3. Q As you sit here today, do you have any -- any reason -- can you think of any reason why Willie would be there? A You know, I -- I -- I certainly trust Willie's judgment. He had to be looking at something, but I have no idea what it was or know -- know why he was there. I don't believe anyone told him to go do anything back there. I know that I had not. Q And no one had told you that they had instructed Willie to go in that area, correct? A That is correct.

Page 74: Q And in -- in your experience in the marine industry, have -- have you ever experienced a similar

Page 75: incident to the one that Willie had incurred? A No, sir. I have -- in the years that I've worked offshore, I've -- other than the most minor scrapes and bruises, I've never had a man injured and I've never damaged a vessel since I've been out there, ever.

Page 75: Q And -- understood. And on the vessels that you've been on in the marine industry, have any had a similar -- call it gully or trough or -- or what's -- the area that's depicted where your foot is on Exhibit 3, have any had a similar type of con -- configuration? A As I remember, all of them were like that. Q Okay. So, this was not a unique configuration, in your experience? A Not to my recollection, no, sir.

Page 75: A I have not worked with many -- we used to call them anchor boats when we would move semi-submersibles and things of that nature. I ran a boat for several years -- several boats that had deck winches on it for moving anchors and what have you, and they all were configured like that.

Page 75: Q Okay. By configured like that, do you mean with that gully, trough around it?

Page 76: A Yeah. I -- I call it a channel. It helps route wash and water off the deck.

Page 76: Q Understand. And in -- in all of -- in those boats where you had a similar configuration, have any of those had a -- a grating cover on them, in terms of -- by that -- A No -- Q I'm sorry. A Not to my recollection, no. They were all open like that.

Page 76: Q Okay. And as you sit here today, do you believe that it was -- that area was unsafe at the time of Mr. Hawkins incident? A No, sir.

**MR. JUDE ORGERON TESTIFIED AS FOLLOWS:**

Page 7:Q.· Who do you work for? 24· A. Sea Support Ventures.

Page 13: Q. Did you get a copy of like a company or 25· employee handbook or safety manual, anything like

Page 14: ·1· that? ·2· A. Yes, sir.

Page 17: · Q.· How long do you think you worked with 16· Mr. Hawkins on the Miss Aline? 17· A. Probably about five, six months, I guess.

Page 18: Q. Would y'all often work together when you 11· were aboard the boat? 12· A. Yes, sir. 13· Q. Were you assigned to the same shifts 14· often? 15· A. Yes, you could say that.· Yeah.

Page 18: Q. Do you remember what Willie's job or role 17· was aboard the vessel? 18· A. Willie was a deckhand.

Page 18: Q. Okay.· And what was your position at the 20· time? 21· A. I was a deckhand too.

Page 18: Q. Were you more senior than Willie? 23· A. Yeah.· Yeah, I guess so.· I had more 24· experience.

Page 19: Q. Did you ever have to give him instructions ·4· on anything? ·5· A. No.· I don't give nobody instructions.

Page 19: 18· Q. Well, were you -- were you working at the 19· same time when Willie got hurt? 20· A. No.· I didn't hear about it until a couple 21· days later when he complained.

Page 21: Q. And this safety meeting, would that have 16· been with everybody on board? 17· A. Yeah.· They mustered everybody and went 18· and looked at where it happened, and they moved 19· some stuff out the way.

Page 22: ·1· with you. ·2·All right, Mr. Orgeron, I'm looking at Sea ·3· Support 2155 here.· Is this the wind foundation ·4· you were referring to? ·5· A. Yes, sir.

Page 22: Q. Okay.· Can you tell me, just based on your 20· recollection, what was different? 21· A. At the time, that chain lock on the side 22· wasn't there. 23· Q. This right here (indicating)? 24· A. Yes, sir. 25· Q. Okay.
Page 23: ·1· A. And they had an 8-by-10 Conex box about ·2· where that barbecue pit's at.
Page 23: Q. Right here. ·4· A. With about a 4-foot spot to walk.
Page 23: Exhibit 1.
Page 23: Q. And what kind of things did you clean up? 17· A. They had two pallets with some equipment 18· for an operation that we do on the job, and they 19· just moved it to the back of the winch, to 20· underneath the stairs.
Page 23: Q. Were those pallets sort of blocking the 22· walkway? 23· A. No.· There was a clear path to walk.
Page 23: Q. Were there any like tools or any sort of 25· canvas bags, anything lying around?
Page 24: ·1· A. Yeah, they had a pallet with some bags, ·2· canvas bags with some tools, and they had another ·3· pallet with, they call them, some chocks.
Page 24: · Sea Support 128, and I'll go ahead and 10·mark it as Exhibit 2.
Page 24: Q. Would this have been the walkway there on 15· the morning when y'all had the muster?
Page 24: A. Yes, sir, as far as I can see.
Page 24: Q. Okay.· And it looks like -- it looks 21· like -- up here in the top left-hand corner, would 22· that have been the -- for example, one of those 23· canvas bags that you were talking about? 24· A. Yes, sir, as far as I can see.
Page 24: Q. And based on your recollection, how much
Page 25: ·1· space did you say there was between the -- sort of ·2· the deck winch here and the Conex box? ·3· A. About 3 to 4 feet.
Page 26: Q. Is it a -- about how wide is the crack? ·9· A. About 8 inches, I guess.
Page 26: Q. Does it run all the way around the -- sort 11· of that tank or the reservoir that the -- the 12· winch sits on? 13· A. Yes, sir. 14· Q. And is it a different height than the deck 15· itself? 16· A. Yes, sir. 17· Q. And how deep is it? 18· A. The thickness of the deck boards. 19· Q. What's that, 2 inches, something like 20· that? 21· A. Yeah, about.
Page 27: Q. You mentioned that there were some pallets 11· back there with tools and chocks.· Was that the 12· sort of thing that you'd have to carry stuff back 13· there to get to those pallets? 14· A. Yes, sir.
Page 27: Q. Do you think -- do you think it was 16· necessarily safe to have that crack or channel 17· running along back there where folks might be 18· working?
Page 27: A. As long as you're paying attention to what 22· you was doing, I mean, it could have been safe. 23· Ain't nothing on that boat really safe.· That's a 24· part of the workplace, you know.· You got to pay 25· attention.
Page 28: ·2· Q. So I understand what you're saying there, ·3· just part of working offshore is always going to ·4· be somewhat dangerous.· Is that what you're ·5· saying? ·6· A. Yes, sir.
Page 36: Q. Okay.· Now, Willie -- Willie testified ·7· that it was about 4:00 -- 4:00 in the morning when ·8· his accident happened.· He says it was still dark ·9· out. 10·Was there any lighting in this area of the 11· Miss Aline? 12· A. Yes, sir.

Page 36: Q. Willie said it was still pretty dark.· You 14· know, in your recollection, is the lighting 15· particularly bright?· Does it do a good job of 16· illuminating everything? 17· A. It sure does.

Page 39: 21· Q. Okay.· And on that second hitch, after 22· Willie got hurt, when he came back, did he ever 23· say anything about what had happened to him when24· he was out or what sort of medical treatment he 25· had?

Page 40: A. Yes, sir.

Page 40: Q. All right.· What did he tell you? ·3· A. He said he had surgery on his knee, he ·4· didn't go to physical therapy, and he built a ·5· carport at his house.

Page 40: 11· Q. Did he say he himself built it, or he had 12· somebody build it? 13· A. That's what he said.· He said he didn't 14· need physical therapy because he was going to work 15· it out himself.· He built a carport.

Page 43: ·1· Q. I mean, do you -- do you think it was a·2· good idea to have Willie down on his hands and ·3· knees working that quick after knee surgery?

Page 43: · A.· I mean, Willie never objected to it.

Page 43: Q. If you -- if you were in the same 18· position, would you have hoped the captain would 19· have taken that into account, maybe not had you 20· down working on your knees like that?

Page 43: 23· A. I'd have told them I wasn't going to do 24· it.

Page 47: ·5· Q. Jude, you described earlier in your ·6· deposition -- or you mentioned a topic called ·7· chocks. ·8·Can you tell me, what are chocks? ·9· A. It's made out of some pipe, and they put 10· that on the side of the ship to run some rope 11· through so it don't chafe on the side of the ship.

Page 47: Q. Do you know how large these chocks were 13· that were on the Miss Aline? 14· A. They're about a foot and a half wide, I 15· guess about a foot tall. 16· Q. Do you know how heavy they were? 17· A. They were fairly heavy.

Page 47: · Q.· Did you ever have to carry the chocks? 19· A. Yes, sir, every job. 20· Q. How many chocks would you typically carry 21· at a time? 22· A. One in each hand.

Page 47: 23· Q. One in each hand. 24·All right.· When you were carrying the 25· chocks, were you able to see where you were

Page 48: stepping? ·2· A. Yes, sir. ·3· Q. Carrying one in each hand, would you carry ·4· them by your side? ·5· A. Yes, sir.

Page 48: Q. Did you ever see Willie carrying any ·7· chocks? ·8· A. Yes, sir. ·9· Q. From when you observed him carrying the 10· chocks, how did he typically carry the chocks? 11· A. He'd either carry one at a time or drag 12· them. 13· Q. Okay.· Did you ever see him carrying two 14· chocks? 15· A. Not that I recall.

Page 48: Q. And did you receive any training on how to 17· carry the chocks? 18· A. No, sir.

Page 49: Q. At that time, prior to his incident on 12· September 13, 2020, where was the pallet that had 13· the chocks on it? 14· A. On the left side of the walkway.

Page 49: Q. Okay.· How would you access the pallet 16· with the chocks to either place chocks on there or 17· remove the chocks? 18· A. You walk straight up to it and put them 19· down or grab them. 20· Q. Did you need to go around the Conex boxes? 21· A. Yes, sir.· It was on the starboard side of 22· the Conex box.

Page 49: Q. It was on the side. 24·Would you be able to access it without 25· having to pass by the deck winch?
Page 50: · A.· No, sir.
Page 50: 13· Q. Do you recall if anyone had any problems 14· prior to Willie's incident with walking by the 15· area where Willie's incident occurred? 16· A. No, sir.
Page 56: ·5· Q. Okay.· And certainly, if Willie deemed it ·6· unsafe to traverse this area, he could have ·7· exercised stop work authority, correct? ·8· A. Yes, sir.
Page 56: 18· Q. Okay.· Did you deem that area to be 19· unsafe? 20· A. Not at the time, no.
Page 57: · · · If you or Willie or anyone aboard deemed ·6· that area to be unsafe, you had the ability to ·7· exercise stop work authority and have that area ·8· cleaned, correct? ·9· A. Yes, sir.

**JONAH LEDWELL TESTIFIED AS FOLLOWS:**
Page 8: Q. Who is your current employer? A. Sea Support Ventures. A. I'm a mate.
Page 9: A. The Miss Aline.
Page 19: Q. And do you happen to remember what you would have been doing that day? I know it's over a year later now, but -- A. I was working as a deckhand on the Aline, and I believe we did our gear deploying or recovering operation, I guess, that morning.
Page 19: Q. So Willie testified that his accident happened somewhere around 4:00, 4:00-ish in the morning. It was still dark out. Does that sound about correct?
Page 19: A. Yes, sir. 17 Q. And so, you-all -- were you up doing the 18 same job as Willie that morning? 19 A. Yes. 20 Q. And that was gear deployment or recovery? 21 A. Yes, sir.
Page 20: Q. So Willie testified that he was handling 20 some chocks. Do you know what those are? 21 A. Yes, sir. 22 Q. What is a chock? 23 A. We would carry portable chocks out to the 24 ship if they needed assistance getting fenders on 25 board the ship, I guess. It's a -- I don't know -- a
Page 21: big, heavy metal rubber block, I guess. Q. Okay. And they are heavy, though? A. Yes, sir. Q. Do you have an estimate of about how much they weigh? A. Estimate, maybe 40 pounds apiece or so.
Page 21: Q. Can you carry one or two of them? A. Yes, sir.
Page 21: Q. How would you normally carry them, I guess? A. Oh, carrying two, you can just grab one in each hand pretty much on a little, I don't know, handle or rope, whatever is tied off to them and carry them. And a single one, kind of you can do that or use two hands and carry it around.
Page 21: Q. And that morning, was there a pallet for those chocks out on the back deck of the Miss Aline? 17 A. Yes. 18 Q. And where was that pallet located? 19 A. I believe -- honestly, I don't recall 20 because we moved it around several times; but I 21 believe it was next to a CONEX box.
Page 22: at Sea Support 2155 here. I'll mark it as Exhibit 1.
Page 23: Q. So if we're orienting ourselves, the morning of Willie's accident would the pallet for the chocks have been somewhere back here along the -- near the wall? A. Yes.
Page 23: Q. Okay. And so, in order to access that pallet, would you have to walk between here sort of next to the tank and the deck winch? A. Yes.
Page 23: Q. Generally, how -- was there, like, clutter 20 or things along the walkway near the box and the 21 winch? 22 A. Yes. 23 Q. And that would have been some bags and some 24 tools and things like that? 25 A. Yes.

Page 24: A. Straps, shackles, kind of regular --
Page 24: A. No. I'm sorry. That's pretty much it. Nothing major.
Page 24: Q. And did that channel run all the way around the box? A. Yes. Q. About how wide is the channel? A. Probably e or 3 inches. 17 Q. Do you have any idea how deep it was? 18 A. Probably 2 inches.
Page 26: Q. Did you have a chance to see where Willie hurt himself? A. Yes. I'm sure I walked past it, you know, that morning also. Q. And does this photo generally comport with your memory?
Page 27: A. Yeah. Yes, sir.
Page 28: Q. (BY MR. CHAPEL) Okay. About how much 20 space was there between the -- you know, this gap or 21 this channel and -- how much space was there in the 22 walkway between -- for someone to walk through like 23 Willie between that and the channel itself?
Page 28: A. Of -- it was average, I guess. Around 3 -- 2 and a half, 3 feet of walkway to walk past it.
Page 29: Q. And do you think letting the tools and other things sort of clutter up in that walkway, you know, caused or contributed to Willie hurting himself and stepping down into that channel?
Page 29: A. That I don't know.
Page 32: Q. And what did he tell you? S A. That his foot slipped off the edge and went PURPOSE into that channel and he hurt his knee, I guess.
Page 35: Q. And what did you-all -- what did you-all come up with about how to prevent it from happening again? A. We kind of removed all the clutter from around there, and then later on the grating idea came up and that got initiated.
Page 37: Q. And do you agree that this narrowing of the walkway was the primary reason for Willie Hawkins injuring his knee?
Page 37: A. That I don't know.
Page 37: Q. (BY MR. CHAPEL) Sorry about that. Which 18 part? So would you agree that the clutter caused the 19 walkway to be narrowed? 20 A. Yes.
Page 37: Q. And would you agree that that was the primary reason for Willie injuring his knee?
Page 37: A. That -- I can't answer that. I don't know. Q. (BY MR. CHAPEL) Do you think it played any
Page 38: role in Willie injuring his knee?
Page 38: A. I don't know. I mean, I walked through it as many times as he did. So I don't know.
Page 39: Q. Okay. Was there any lighting in that area aboard the Miss Aline? A. Yes. Q. How much lighting is there, I guess? A. Oh, I mean, I would say it's well-lit. Q. If Willie said that he was having a hard time seeing that morning, would you agree or disagree?
Page 39: A. I -- I didn't have any trouble seeing, so I 18 don't know about him. I don't know.
Page 40: Q. And you think measures should have been taken ahead of Willie's incident to prevent it from happening?
Page 40: A. I -- that I don't know. I mean --
Page 46: Q. Okay. And I think you mentioned that on the ground there would be some bags or other objects. Do you recall that testimony? A. Yes. Q. Okay. And you said you walked that area multiple times before Willie's injury? A. Yes, that's right.
Page 47: Q. So you've been in the offshore industry for going on 20, 21 years?

Page 47: What type of objects would be in that 2 and a half to 3-foot walkway? A. Straps, shackles, lines. It's miscellaneous cargo handling equipment.

Page 48: Q. Okay. Now, in your 20 to 21 years of experience in the marine industry, you know, was that typical to have those type of objects on the deck of your boats? A. Yes.

Page 48: Q. And so, it -- would you describe the situation or what the area looked like around Mr. Hawkins' injury as something you would typically see, or was this an atypical situation? 17 A. I thought it was typical.

Page 49: Q. Okay. And at least in the times that you traversed that area prior to Mr. Hawkins' injury, did you have any trouble with those objects being in your way? A. No. Q. All right. You were able to -- to go to and from where you were needing to walk using that route? A. Yes.

Page 49: Did you ever speak with Willie about anything regarding building a carport? A. Yes. Q. Okay. Can you describe that conversation? A. Yes. He showed me a picture of a carport he built, and I was impressed, of course. And he -- he said he built it himself, which was very

Page 50: surprising.

Page 50: Q. Did he say he enlisted any additional help with the carport? A. No. He said he built it by himself.

Page 51: Q. Now, we talked a little bit about -- you 17 talked a little bit with Mr. Chapel regarding what 18 you would expect the captain to know and not to know 19 regarding someone's ability to work. 20 Would you expect the captain to know 21 that an individual could or could not perform the 22 work if that individual did not tell the captain? 23 A. No. 24 Q. As a captain, are you a mind-reader? 25 A. Nope.

Page 52: Q. If you are given a full return to work for an individual who used to be -- who is returning to your ship, do you have any expectation that he can't perform the work that they are supposed to do? A. No. They should be 100 percent.

Page 55: Q. And certainly if you deemed it unsafe prior to Willie's injury, you could have issued stop work authority, correct?. Correct.

Page 55: REA Q. And is that because you didn't believe the area was unsafe? A. Correct.

Page 55: Q. Prior to Willie's incident, did you believe the area where Willie's incident occurred -- did you believe that that area was unsafe?

Page 56: A. No.

Page 57: Q. By signing that document, were you intending to say that you believed that Willie's

Page 58: incident was caused by any sort of bags or other clutter that might have been in the walkway?

Page 58: A. That I -- no, I didn't really think of it like that.

**CAPTAIN BURNELL DOMINIQUE, TESTIFIED AS FOLLOWS:**

Page 9: ·Q. Who is your current employer? ·A. Sea Support Ventures.

Page 9: ·Q. And what kind of vessel is the ·Miss Aline? ·A. OSV supply vessel.

Page 24: ·Q. Do you remember him telling you anything ·about any work that he might have done in the ·weeks leading up to when y'all met at the ·office? ·A. As in while he was off? ·Q. Yes, sir. ·A. Yeah.· He told me he built a carport.

Page 24: ·Q. So did anyone other than Willie tell you ·that Willie had been previously injured aboard ·the Miss Aline? ·A. My relief told me whenever I got to work ·that he had been injured. ·Q. Okay.· Who was your relief? ·A. Mike Skinner.
Page 29: ·Q. You wouldn't think that there would be ·any risk in having Willie working on his hands ·and knees after his knee surgery? ·A. There was no information about him being ·on light duty or anything.
Page 29: ·Q. And the only thing that would make you ·re-evaluate about what sort of things you would ·assign him to do is what? ·A. Is if I'm told one of my personnel is on ·light duty.
Page 29: ·Q. And to be clear, nobody had ever done ·that, correct? ·A. That's correct.
Page 41: ·Q. Okay.· Do you think having that channel ·there aboard the Miss Aline presented any danger ·or hazard to the crew working around the winch? ·A. No.· It's been there since -- I guess
Page 42: ·since they installed it.
Page 42: ·Q. Okay.· I'm not saying that y'all put it ·there.· I'm asking you whether it being there ·constituted any sort of hazard to the crew ·working around the winch? ·A. There is a slipping hazard, yes.
Page 49: ·Q. Did you ever hear anything about ·allowing clutter to build up in that area of the ·back deck? ·A. No.· It was like that. ·Q. It was always cluttered, is that what ·you mean? ·A. After work it would be cluttered or ·during work, and then they would clean it up. ·Q. Would you agree that that -- allowing ·that clutter to stay there would be ·inappropriate or incorrect? A. Yes.
Page 49: ·Q. That's something the captain should have ·never allowed, correct?
Page 50: ·A. Again, if the captain's on the bridge at ·the time of the work being done, he can't ·control what they do by not picking up their ·tools until you're able to get out of the bridge ·and make a walk around.
Page 65: ·Q. Okay.· And you would expect your ·deckhands, if they saw clutter or an issue prior ·to, let's just say, walking in a particular ·area, if they saw any issues that needed to be ·cleaned up, they would do that before walking in ·that area? ·A. Yes.
Page 67: ·Q. And that's your expectation as the ·captain that if someone else who has firsthand ·knowledge seeing a potential hazard, that's your ·expectation as the captain that they're going to ·use their Stop Work Authority to raise the issue ·if they feel unsafe?
Page 67: ·A. Yes.
Page 68: ·Q. Okay.· So if somebody says, hey, this is ·going to be an issue, is there -- there's ·nothing that could be done about that, right?
Page 68: ·A. You could put caution tape.

**CAPTAIN MICHAEL SKINNER TESTIFIED AS FOLLOWS:**
Page 9: A. Sea Support, yeah.
Page 17: Q. And you came back to be a Captain,
Page 18: correct? A. Yeah, that's true.
Page 18: Q. And what was the vessel you were assigned to? A. The Miss Aline.
Page 18: But when I got on it, they had rigged it up to do the lightering, if you know what that is, work to put the gear out. Our job was to put the gear out on the ships with the crane on the ship. So then they would take it up and they would -- the mooring master -- not the mooring master, but the mooring master

Page 19: assistants would put the yokohamas and the cables and string that stuff up for the two tankers to come together.

Page 19: And what they were going to do is they were going to transfer oil out of the one tanker into the empty one. And generally the empty one would be somewhere from China or India or something like that. And my understanding is that it was all like fracked oil and that's what they were selling over the -- overseas.

Page 19: A. Yes, sir. doing the lightering work, we primarily worked out of Freeport, Texas.

Page 19: What we -- while we were

Page 20: A. Yeah. I worked with a fellow by the name of Maurice O'Brien

Page 21: A. Okay. Well, I'm -- I do remember that when I was off duty is when the whole incident with Willie happened. Q. Yeah.

Page 22: A. Let's see. Our crew -- the Sea Support crew, there were two people in the wheelhouse. That was me and Captain O'Brien. And then there was a couple of engineers. Okay. And then we had generally three in the deck department, whether they were ABs or ordinary seamen or whatever.

Page 22: Q. Do you remember a Jude Orgeron? A. Yes.

Page 23: ordinary seaman.

Page 23: I remember Jude. He was a good hand, though. He was really the deck foreman when we were doing the -- putting out the gear and everything and -- and picking it up.

Page 26: Q. Do you know Lance Broussard? A. Yeah, I believe he was a chief engineer. Q. Okay. And then how about Henry Vertrees?

Page 26: A. Yeah, Henry was a -- Henry was a licensed engineer.

Page 30: Q. Of course not. As part of the duties of being a Captain, does that involve doing inspections or rounds aboard the vessel? A. Yes. I -- I would do mine and then, you know, we would kind of delegate out some things, like the engineers would look at the stuff that's in their department and even -- even the deck personnel would get involved with some of the, you know, like counting the life jackets and making sure they're good and straightened up and all this kind of stuff,

Page 31: yeah.

Page 31: -- my basic rule of thumb was hey, if you see something that doesn't look right, let myself or Captain O'Brien know so we can look into it and see what's going on. But basically keeping everything straightened up on the vessel and all this kind of stuff and don't leave anything that's going to be a tripping hazard out or anything like that.

Page 31: Q. If I'm understanding you correctly, y'all -- you were out -- you and the other Captain were out there trying to find any issues or identify any hazards, but you also asked that people would help y'all identify them and bring

Page 32: them to your attention as well? A. That's correct. Basically it was like hey, if you see something, say something.

Page 32: Q. All right. A. Let us know. You know, if you see something that's not quite right or out of whack or if you see a hazard, let us know, because we might miss it, you know, and y'all are out there on the deck all the time, so keep your eyes open and tell us what you see and we'll address it.

Page 32: A. Well, generally we did it every -- okay. I'm going to tell you like this first. Generally we would do it every -- every week, like on a Sunday or a Saturday, depending on what we were doing. But they also issued -- in the safety manual, they would tell you what

Page 33: drills they wanted run on what days and all this kind of stuff. And then it would go on to say what your safety meeting topic for that -- that little round should be. So that's -- that's kind of what we went by. Q. Got it. Did you ever have to run any JSAs? A. Oh, yeah.

Page 37: Q. Before then -- before Willie's incident, had y'all ever gone down and did a round or inspect just to see how the -- what

Page 38: shape the back deck was in? A. Oh, yeah. Yeah. Walk around back there and take a look and see where the tires are -- maybe have broke a chain and we need to pull that up and get it re -- reshackled in because, you know, the tires are the protection on the stern around the corners and everything and you had to lay against the ship and sometimes you had to pivot off of it. So yeah, that was kind of important.

Page 39: A. Teekay Marine.

Page 39: Q. Yeah. A. Yeah. That was the client, yes,

Page 40: So the channels, the recessed parts around that were -- now, what they were used for, I don't know. But it seemed like it was meant to channel the water away and get it back on the back deck, the sea water and stuff. Because I only saw it taken apart one time.

Page 40: Q. Was that something that you thought in any way posed a risk or a hazard to any of the crew? A. Well, we talked about it, said hey, you're just going to have to be very careful, there's nothing I can do about that, you know, and I don't know if they're going to modify the

Page 41: back deck here to fix that, so just be aware, be kind of careful when you're moving around. And, you know, then after Willie's injury is when some of the other clutter was cleaned up. But that was after the fact, like those turnbuckles and all that kind of stuff and put them in the connex, yeah.

Page 41: Q. All right. Let me -- let me see if I've got you straight here. You appreciated the fact that that channel next to the winch there -- right up against the winch there was a hazard that people needed to watch out for ahead of Willie's injury, correct? A. Yeah.

Page 41: Q. And you said you told the crew that hey, watch out for this, I don't -- I don't know what they're going to do with it, I don't know if they're going to take care of it, but just keep your eyes out? A. My words more than likely were just hey, be careful when you're messing around back here because when we're using this winch, just watch out what you're doing, don't get in a real

Page 42: big hurry and watch where you put your feet.

Page 42: Q. And was your concern over the channel something like along what happened, concern that somebody's foot might go down in there? A. Well, I saw where it could be a possibility, you know. I mean -- I'll just say

Page 43: this. When you're working in -- in the working environment, you know, and it's not always just real calm and everything and things are moving -- vessels are moving around and all this stuff, is somebody going to really pay attention and watch where they're stepping? Well, I hope so.

Page 43: Q. All right. A. But you can't make them.

Page 46: -- you said you were telling some folks to watch out for the channel ahead of Willie's injury. Do you happen to remember having that conversation with Willie? A. Usually ol' Willie, he just like yeah,

I'm watching out, I ain't going to get hurt, that kind of thing there, you know. But it really didn't matter what he said to me. I

Page 47: just had to tell him or them to watch where you're stepping, be careful.

Page 47: Q. I guess my -- my specific question is: Do you remember having those specific conversations about the channel with Willie ahead of his injury? A. I just remember telling him just be careful, man, moving around back here when you're around that winch and everything, just be careful moving around. I mean, I like ol' Willie, but I mean, he -- he was -- he's kind of portly, you know. But I mean, he's a good guy.

Page 47: Q. Yeah. So if I -- if I understand you correctly, you remember having a conversation with some folks about hey, this -- there's this specific hazard around the channel. You can't remember if you had that exact conversation with Willie, though, correct?

Page 48: A. You know what, I feel like I mentioned it to him and pointed some stuff out.

Page 49: Q. Okay. Now, I wanted to ask you, had you ever had a talk with anyone from Sea -- from Sea Support, like the office, about the channel around the deck winch prior to Willie's injury? A. No. What I talked to them about didn't -- wasn't specifically about the channel. It was just about the -- the clutter, the stuff laying around, everything that belonged to Teekay Marine really, because that was really all of theirs.

Page 52: Q. This is Sea Support 2155 and we'll go ahead and mark it as Exhibit 1.

Page 52: A. Yeah, I'm looking at the -- it looks like we're looking at the winch. I see the big drum and then the small yellow buttons that you can turn stuff around. I see the yellow grating in the front.

Page 57: Q. No. I'm saying having the -- having the grating all the way around the channel filled in -- I'm asking you whether you think having the grating filled in all the way around the channel would have helped avoid this accident?

Page 57: A. I don't know. I just -- I don't know. I -- that's kind of speculation on my part. I just -- I just think it's a -- it's a good addition.

Page 59: Q. Okay. Support 128 and I'll go ahead and mark this as Exhibit 2.

Page 61: Q. And does this -- does this generally look like what you saw? A. Yeah, but there was more stuff laying around.

Page 61: Q. So you're referring to like this -- what looks like a bag here and what looks like a little bit of -- A. Well, that, and not only that, but they had some other stuff that belonged to Teekay Marine that was kind of laid around. Q. So there was more clutter in the walkway here around the box than what's depicted here in this photo? A. Yeah. To my knowledge, yeah.

Page 62: Q. And you considered it to be -- considered them to be unsafe tripping hazards, things like that? A. Yeah.

Page 65: marked Sea Support I'll mark it as Exhibit 3.

Page 65: Q. Does this look like a personal -- or an incident report that you might have to fill out with Sea Support? A. Yes, it does.

Page 67: It says, Between the connex box and winch where the deck level changes, it lowers about two inches portside. Knee is sore and slight swelling. Stepped on place where level changes and twisted right knee while falling.

Page 68: Sea Support 129. I'll mark it as Exhibit 4.

Page 74: A. And so that's when I approached the mooring masters and the mooring master assistants. It was their equipment and so, you know, I kind of wanted our people to know what to do with all this stuff. And if they told us where to put it in the connexes and stuff, then we wouldn't get in any trouble for hiding their stuff, which we wouldn't have been hiding it anyway, just picking it up.

Page 74: Q. And I want to make sure I got this right. It was Teekay's stuff, but it was the

Page 75: Sea Support crew's responsibility to keep the stuff organized and make sure that it was put away? A. No. No. That's not true.

Page 75: Q. Okay. A. They had the mooring master assistants on board. That's -- they're the ones that mess with that equipment, that mess with all that stuff. That's their connex box that they put their gear in and stuff. Okay?

Page 75: Q. Uh-huh. A. That's -- that stuff didn't -- didn't belong to Sea Support at all. It was just on the vessel to do the job. So instead of it just laying around out there and everything, then that's the reason we got with them and offered to help them, you know. Didn't expect them to do it by their self and picking up some of the ropes and the cables and getting all straightened up and all this kind of stuff and put it away.

Page 75: Sea Support 1121 through 1122 and I'll go ahead and

Page 76: mark that as Exhibit 5.

Page 80: Q. Okay. I want to -- one other -- the last thing I sort of want to get clear on and make sure I understand is with regard to whose responsibility it was to make sure that the back deck was picked up and organized ahead of Willie's injury? A. Well, like I told you before, anybody that saw anything out of -- like stuff not being put away and all this kind of stuff, just report it to somebody. They could report it to me, one of the chiefs, Captain O'Brien. It didn't matter. Just let somebody know.

Page 80: Because as I told you before, then, you know, we're not on the back deck all the time working in the wheelhouse, but everybody is understood that you're supposed to, you know, kind of let

Page 81: us know so we can get something done about these things.

Page 81: Q. And I'm asking you -- I guess I should have made my original question clearer. Was the responsibility for maintaining the organization of the deck solely the Sea Support crew members, yourself included? : Objection, form. A. Well, I mean, I have some thoughts about that myself. I mean, those mooring master assistants and all that kind of stuff, now they -- they know not to leave stuff laying around

Page 82: everywhere, and so that's Teekay people, but --

Page 82: But if they were going to stick by the books, right, is it Teekay's responsibility to participate in the organization, maintenance of the back deck?

Page 82: A. I think so.

Page 83: Q. Now, I'll ask you this way. Do you think that Teekay played part of a role in contributing to Willie's accident?

Page 83: A. I just think that they should have probably helped pick up the stuff before it got to be an issue.

Page 88: Q. Okay. Is there -- I meant to -- is there lighting in that area of the Miss Aline? A. Around that winch? Q. Yeah. A. Yeah, there was florescent lighting. And we had some other lights that I remember that were kind of a little bit further -- or closer back to the superstructure that threw some light out there.

Page 88: Q. Were they -- were they particularly bright? Do you think they did a good job of illuminating the working environment there if it was dark out? A. Yeah. I mean, we had cameras all over, so I would kind of look at the cameras when we were picking up or laying out and it

Page 89: seemed to be lit up pretty good.

Page 92: Q. Did anyone mention to you after Willie's incident any issues with that area not being lit up at the time of Willie's incident? A. No. No.

Page 99: Now, would you -- was it your expectation as the Captain that if -- if one of your deck hands saw an issue that they thought was unsafe, that they would tell you about it? A. Yes.

Page 99: Q. All right. And that's -- if what I'm -- did you convey that message to them, that that was the expectation?

Page 100: A. Yeah. Q. And does that include Willie Hawkins, that that message was conveyed to him? A. Yeah.

Page 101: Q. Now, as part of your duties as Captain of the -- of the Aline, did you convey that to the crew aboard, that they all had stop work authority? A. That's true, yes. Q. And does that include conveying to Willie Hawkins that he had stop work authority? A. Yeah.

**MR. HENRY E. VERTREES, JR. TESTIFIED AS FOLLOWS:**

Page 8: Q. And then do you have any certificates or · licenses that you've gotten since then? A. I got a license from the U.S. Coast Guard · for engineer.

Page 11: Q. And what was your position with Sea · Support? A. I started as an engineer, then they bumped · me down to a QMED.

Page 11: Q. Okay.· What was the vessel you were

Page 12: assigned to during your time with Sea Support? A. The Miss Aline.

Page 12: Q. Okay.· Were you still an engineer at that · point or had you been bumped down? A. I'd been bumped down.

Page 12: Q. Okay.· Who was your captain while you · served aboard the Miss Aline? A. There was Burnell Dominick, Michael · Skinner, Maurice O'Brien.· I think that's it.

Page 20: Q. So you couldn't actually see where Willie · got hurt? A. I could not see it.

Page 21: Q. Why did you get out of the control house · to go see Willie?· Did you know that he had been · hurt? A. The job was -- the job was over.· They · didn't need me up there no more.

Page 22: Q. Did he tell you how he injured himself? A. His foot got stuck in a trough.

Page 22: Q. Okay.· What -- what is the trough that · you're talking about?

Page 22: THE WITNESS:· · · The equipment the winches sit on.· They like between that and the deck· boards.· They had maybe like 2 or 3· inches, like channel that's underneath· running through it though all the way· around.· That kind of -- it's a trough.

Page 22: Q. And that trough or channel, is that · something that you knew about or -- before you · heard Willie talk about it? A. Yeah, I knew about it.· Everybody on the · boat knew about it.

Page 23: Q. Why can't the deck boards go too close? A. They could though, but in case -- for like · expansion and stuff. · Q. Expansion of what? A. Of metal.

Page 23: Q. So this is Sea Support 128, I'll mark it · as Exhibit 1.

Page 23: Q. I'll represent to you that here Captain · Maurice O'Brien told us that this was his foot. · Okay?· Is this the trough or the channel that you · were referring to? A. Yeah.
Page 24: Q. And had anyone ever told you about the · channel or the trough here that surrounds the tank · the winch sits on? A. I mean -- I mean, nobody had to tell me · about it.· You got to see it.
Page 24: Q. Well, did Captain Skinner ever sit y'all · down and tell you, Watch out when you're working · around the winch? A. Yeah.· I mean, every time we do a job, we · all have a meeting.
Page 25: Q. Okay.· So specifically just about the · trough, did Captain Skinner warn you about the · trough? A. Yeah.
Page 25: Q. Okay.· And did you go out and look at the · trough, the channel, after Willie's incident? A. We all went and looked at it.
Page 25: Q. If you look here in Exhibit 1, is that · generally what the trough looked like at the time? A. I'd say that's probably so, yeah.
Page 25: Q. And it looks like there's some, I don't · know, debris or equipment over here on the side. · Do you know what this is? A. That must be the -- all them boards? · Q. Yeah.
Page 26: A.· It looks like the third-party stuff.
Page 26: Q. It would be the stuff belonging to TK? A. Yes.
Page 26: Q. Okay.· And it's just some equipment and · stuff that y'all use? A. Yeah, it's mainly like the bags that they · take off there with, portable chocks if they need · them.
Page 26: Q. And when you went out there to check on · the area where Willie got hurt, was there a bunch · of that stuff lying around out there? A. I would say it probably looks just like it · does in that photo.
Page 28: Q. The captain is responsible for making sure · that the crew has a safe place to work, right? A. Yes, but you've got to make sure it's up · to the crew to actually do their job too.
Page 29: Q. Okay.· Now, this channel -- having this · channel and this gap run along -- or sorry, the · trough, I think we were calling it, run alongside · the box that the winch sits on, do you think that · that in any way could pose a hazard for people · working around the winch?
Page 30: A.· I mean, somewhat.· But maybe the backside · of it though.· But like the front side, there's a · lip that hangs over the side -- over though that · actually cuts the whole channel off.
Page 30: Q. Okay.· But what about here where · Willie -- where Willie got hurt, what we see here · in Exhibit 1, is there a lip that covers it up? A. Yeah.· It's small; it ain't that big · though.
Page 31: Q. Do you recall Captain Skinner or anyone · else ever, you know, complaining about the tools · and equipment and everything being left around on · the back deck? A. I mean, normally the deckhands have a · meeting upstairs.· They probably talked about it · with them though, but I never heard anything.
Page 33: Q. So what did y'all -- what did y'all figure · out was the problem? A. That the area was too full of clutter. · And we organized stuff a little more better. I · had -- we had TK cut down -- we had TK -- we had · TK reorganize their stuff to their equipment · though to that area where it would be more · suitable and give a little bit of a walkway.
Page 33: Q. Okay.· I'm going to show you what's marked · here as Sea Support 1121, and I'll mark it as · Exhibit 2.
Page 34: Q. Okay.· And so if I read here, it says, · Please describe the non-conformity.· It says, · Over time, the officers, crew, and customers · allowed a steady but slow increase in clutter in · between the port Conex box and deck winch.· This · narrowed the walkway and was the primary reason · for Willie

Hawkins injuring his knee.· Did I read · that correctly? A. Yeah. · Q. Would you agree with that description? A. Yes. · Q. And then down here it says, Recommended · corrective action:· Eliminate the clutter near or · on walkways.· Did I read that correctly?

Page 35: A.· Yes. · Q. And do you believe that that was a good · corrective action? A. Yes.· For the most part, yes. · Q. And it says here, Preventative action · plan:· Make sure all gear is properly stowed · away.· Did I read that correctly? A. Yes.

Page 35: Q. And would you agree that that was a good · preventative action plan? A. Yes, I agree. · Q. Would you agree that that could have been · something that was done before Willie got injured? A.· Yes, could be.

Page 35: Q. Do you think that that's something that · ought to have been done before Willie got injured? A.· Yeah.

Page 37: Q. Okay.· And by signing it, when they asked · you to sign it, did that mean that you agreed with · what they had wrote on the other side? A. That pretty much states that we · were -- that we attended the meeting. · Q. Okay.· It doesn't mean that you agreed · with what it says? A. No, it doesn't mean you agree with that.

Page 37: Q. But you're telling me here today when we · go through it you agree with it, correct? A. Yes.

Page 37: you Sea Support 2155.· I'm going to mark this as · Exhibit 3.· Okay?

Page 38: Q. I'm also going to show you Sea Support · 129, and I'll mark it as Exhibit 4.

Page 39: Q. Is it possible that the trough or the · channel could have been cleaned out ahead of time · and painted yellow ahead of Willie's accident?· MR. MAROCCO:· · · Objection; form. A. I seen the deckhand like by that channel · numerous times trying to paint it though.· But · offshore in rough weather it was just -- it ate · the paint up.

Page 40: Q. Okay.· So how long after Willie's accident · did they start painting the channel? A. I mean, they painted -- they tried · painting it like right after.· But like I said,

Page 41: paint -- yellow paint and salt water don't mix · that well.· It will be barely dry, then either it · rained or it went out in rough seas it came all · off.

Page 42: Q. Okay.· Do you know who ordered it? A. Burnell did. · Q. Okay.· Do you know why he ordered it? A. To make sure that whatever happened, it · didn't happen again.

Page 47: Q. And Captain Burnell would have heard him · say, Hey, I'm just coming back from knee surgery? A. No, he didn't.· He knew that he'd come · back, he explained to him that he's good to go. · He said he's good to go.

Page 48: Q. And so you're saying Willie actually said, · Hey, I can't go do that? A.· He never told me that.

Page 50: Q. Okay.· If you had been coming back from · knee surgery, would you want to be on your hands · and knees chipping and grinding for hours?

Page 50: A.· I wouldn't have been.

Page 50: Q. Would you expect your captain to know · you're coming back from knee surgery and not have · you do that?

Page 50: A.· I mean, yeah, but at the same time though, · I mean, you have to look at that point too though.

Page 51: I mean, if the guy says he's 100 percent though, · you've got to believe he's 100 percent.

Page 51: Q. Okay.· So if you're in Willie's position, · you've just come off knee surgery, would you · necessarily want to be told to get down on your · hands and knees and chip and grind for hours?

Page 52: A. I mean, everything was explained to him · that he -- if he told the captain he was · 100 percent, he's good to go, which he did at the · office, you've got to believe that he's good to · go.
Page 53:First, the area where Willie got hurt, is · that area -- does that area have lights? A. Yes. · Q. Do you know if the lights were working at · the time of Willie's incident? A. Oh, yeah.
Page 53: Q. How would you describe, I mean, the amount · of lighting?· Would you consider it a well-lit · area? A. It's pretty well-lit though.· I mean, it's · like there's three lights up there, like three · bulbs for us to make pictures up there.· I think · one -- two bulbs.· So there's a good amount of · light up there.
Page 53: Q. So if anyone in this matter testified that · the area was dark at the time of Willie's · incident, would you disagree with that? A. Yeah.· Because also every station up there · has a headlamp.
Page 54: Q. And I think I can clear it up.· Are you · saying that everyone who worked out there like · kind of in the night had headlamps, is that what · you said? A. Yeah.
Page 54: Q. So you were out there at the time of · Willie's incident.· I know you didn't see it.· But · was Willie wearing a headlamp at the time of his · incident? A. Yes, I believe so.
Page 54: Q. When you saw him prior to his incident, · did you notice that Willie was wearing a headlamp? A. Yes.
Page 55: Q. Now, did -- what exactly did · Willie -- Willie say regarding what he did during · his -- or let me ask you this -- scratch that.· Did Willie mention to you anything · regarding what he did during his time away from · Sea Support? A. Yeah.· He worked on his carport.
Page 56: Q. Did he mention to you if he did it himself · or not? A. I believe he said he did it himself.
Page 56: Q. Did he mention to you anything about going · to physical therapy? A. He said he went though, but he decided not · to do it.· He decided to do it on his own.
Page 56: -- did Captain Burnell talk to
Page 56: · Willie about his condition prior to starting this · hitch? A. Yes.
Page 58: Q. And I won't even limit it to that hitch. · At any point in time when you were on the Miss · Aline prior to Willie's incident, had you heard · anyone mention that they had any problems walking · in the area where Willie's incident occurred? A. No, I never heard anything.
Page 58: Q. Now, do you know what stop work authority · is? A. Yes.
Page 58: Q. And was the message that y'all had stop · work authority, was that conveyed to you by the · captains aboard the Miss Aline?
Page 59: A. Yeah. · Q. Was that conveyed to every crew member · aboard the Miss Aline? A. Yes. · Q. So if at any point in time you, as Henry · Vertrees, thought that anything was unsafe, you · had the ability to exercise stop work authority, · correct? A. Yes.
Page 59: Q. So if Willie thought it was unsafe at the · time that he was walking in this area prior to · when his incident occurred, he had the ability, · the unfettered ability, to exercise stop work · authority, correct? A. Yes.
Page 60: Q. He said he was released to full duty? A. Yeah.
Page 60: Q. Did he mention to -- during those · conversations that y'all were having in the office · that he had any limitations on the work that he · could do? A. No, he didn't mention none of that. · Q. Did he -- did he say he was a full go? A. Yes, he was a full go.